HUTCHINGS et al. v. CALEDONIAN INS. CO. OF SCOTLAND.

District Court, E. D. South Carolina.
Sept. 26, 1931.

Henry E. Davis, of Florence, S. C., and Davis D. Moise, of Sumter, S. C., for plaintiffs.

J. L. Nettles and R. E. Whiting, both of Columbia, S. C., for defendant.

GLENN, District Judge.

This is a suit on a policy of insurance, use and occupancy type, covering a tobacco warehouse located in the city of Sumter, S. C. The warehouse and contents were completely destroyed by fire on the morning of August 24, 1927. The term covered by the policy was from August 9, 1927, to October 9, 1927.

### History of This Case.

The history of this case is necessary to the understanding of this decision.

The plaintiffs in this suit originally brought suit against the defendant and styled the case as it appears above. This was done, although the policy was written in the name of Hutchings alone. The case came on for trial before this District Court and a jury. At the time of the trial, there was some suggestion of the court transferring the case to the equity side for the reformation of the insurance policy. The court did not transfer the case, and granted a directed verdict in favor of the defendant insurance company. Appeal was taken to the Circuit Court of Appeals, and that court, in an opinion reported in 35 F.(2d) p. 309, directed that the case be sent back to the District Court and transferred to the equity side for the purpose of trying the question of reformation. This court then, carrying out the mandate of the Circuit Court of Appeals, transferred the case to the equity side of the court. The trial was then had on the equity side, with the necessary reformation of the pleadings. This court, once having transferred the case to the equity side, and having, as hereinafter set out in full, decided that it was not necessary to retransfer the case or any phase of it to the law side, but that complete relief could and should be afforded on the equity side of the court, it then became necessary for the court to take testimony and decide on the supplementary question of the amount which the plaintiffs were entitled to recover on the reformed contract. Due to unavoidable delays, hearings were had from time to time, and the matter was finally terminated by argument of counsel and the case submitted to this court for decision.

In keeping with equity rule 70½ (28 USCA § 723), we are filing separately our independent findings of fact which naturally fall under two main heads, as follows: (1) Findings of fact which relate to the question of reformation of the insurance policy; (2) findings of fact which deal with the question of amount of recovery to be allowed the plaintiff.

Manifestly, discussion of the legal phases of the case must fall into the same divisions.

### Reformation of the Insurance Contract.

The decision of the Circuit Court of Appeals in this case was a mandate to transfer the case to the equity side of the court. There is therefore no need for a discussion of the reasons for which this court transferred this case to the equity side and heard testimony on the question of reformation. In the consideration of the evidence, we have constantly had in mind that cardinal rule so well established as the rule which should cover the court of equity in dealing with the reformation of instruments. The rule is that the evidence on which reformation is based must be "clear, satisfactory, and convincing." If this court is correct in its findings of fact as set out in the independent findings herewith filed, then there is no escape from the conclusion that the testimony measures up to this high standard, and that the plaintiffs are entitled to have their contract reformed. Of course, the substantial feature of the reform in the contract is to name as the insured parties Hutchings and Pratt, trading and doing business as the Banner Warehouse, instead of P. L. Hutchings, individually. The court allowed very free and thorough cross-examination of the plaintiff Hutchings, and the attorneys for the insurance company developed matters which introduced some question about the accuracy of all Mr. Hutchings' testimony. But on the material facts involved, namely, whether or not there was ever a clear intention on the part of Hutchings and Pratt to have the policy changed by indorsement from Hutchings, in-

dividually, to Hutchings and Pratt, we have very satisfactory evidence from leading business men of Sumter. There is also the positive statement on the part of the agent of the defendant, insurance company, as to how the transaction was handled.

Without going elaborately into the testimony, we point out that Pratt, a high-type business man, testified positively that he so understood the transaction. While he and Hutchings were partners, yet the evidence shows that, due to Hutchings' difficulties, Pratt, with a stronger financial standing, was responsible for the business going on at all. He had arranged to put the new money into the business, and it was this new money which kept the warehouse going after Hutchings had found himself in financial straits. The testimony is in the record, and we feel sure that the clear and convincing proof justifies the court in concluding that a case of "Mutual mistake" is made out.

Retention of the Case on the Equity Side of the Court for the Purpose of Awarding Judgment and Determining the Amount Thereof.

█ █ The insurance company has never set up any serious attack on the bona fides of the fire. This court, in ruling that the contract should be reformed, disposes of the major question involved in the case. There was presented to the court for further determination the question of whether the case should then be retransferred to the law side of the court for suit at law on the reformed policy.

This matter was fully and ably argued by the attorneys on both sides, and the spirit of the argument was that of helping the court rather than of relentlessly insisting upon a point of view. This court has come to the conclusion that it should in this case follow the well-recognized rule that, where equity has assumed jurisdiction for the purpose of determining the question involved in a case, it will retain jurisdiction and award a recovery without putting the parties to the expense and trouble of a separate suit at law. While there are confessedly some strong opinions by courts ruling otherwise, in our humble judgment the weight of authority sustains the course of this court. This was the course approved by the Circuit Court of Appeals of the Fourth Circuit in the case of Colleton Mercantile & Mfg. Co. v. Savannah River Lumber Company, 280 F. p. 358. Of course, this all involves an application of federal equity rule 23 (28 USCA § 723).

Typical applications of this rule are found in the following cases: Electric Boat Co. v. Lake Torpedo Boat Co. (D. C.) 215 F. page 377; Goldschmidt Thermit Co. v. Primos Chemical Co. (D. C.) 216 F. page 382; American Car & Foundry Co. v. Merchants' Despatch Transp. Co. (D. C.) 216 F. 904, page 911; Goldschmidt Thermit Co. v. Primos Chemical Co. (D. C.) 225 F. page 769; Chanslor-Canfield Midway Oil Co. v. United States, 266 F. page 145, 147 (C. C. A. 9). See, also, recent opinion 4th Circuit Court of Appeals, General Finance Co. v. Keystone Credit Corporation, 50 F.(2d) 872.

### Amount of Recovery.

█ Having disposed, therefore, of the major proposition to be decided, namely, the right of the plaintiffs to have the contract of insurance reformed so as to name as the insured "Hutchings and Pratt, trading and doing business as The Banner Warehouse," we then pass to the question of the amount of recovery under the reformed instrument. The policy is a use and occupancy policy, and sets as a limit of recovery $200 a day. The time covered by the policy is sixty days from the 9th of August to the 9th of October, 1927. As the fire happened on the morning of August 24th, the maximum recovery which could in any event be allowed would be $200 per day for forty business days, or a total of $8,000, but the policy does not stop here. It says that

"This company shall be liable under this policy for the actual loss sustained consisting of:

"1. Net profits on the business which is thereby prevented;

"11. Such fixed charges and expenses as must necessarily continue during a total or partial suspension of business, to the extent only that such fixed charges and expenses would have been earned had no fire occurred;

"111. Such expenses as are necessarily incurred for the purpose of reducing the loss under this policy; for not exceeding such length of time, commencing with the date of the fire and not limited by the date of expiration of this policy, as shall be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of said building(s) and machinery and equipment and stock if liability due to damage to or destruction of stock is included as may be destroyed or damaged subject to the following conditions and limits, to-wit:

"(2) Pro Rata Clause—The amount for which this policy is issued applies pro rata

to each of the following per diem amounts in the proportion that the amount of this policy bears to the aggregate of said per diem amounts multiplied by the respective number of days during which each applies.

"(3) Total Suspension Clause—The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the 'Actual Loss Sustained,' not exceeding the amounts designated for each day of the respective periods defined in the following table and during no other time, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

"(4) For each business day from August 9th, 1927, to the following October 9th, 1927, (inclusive) $200.00."

We feel that we must give force and effect to the phrase "due consideration being given to the experience of the business before the fire and the probable experience thereafter." Frankly, we do not feel that the plaintiffs are entitled to recover the maximum amount when the proper effect is given to this provision in the policy. The court has therefore heard a large amount of testimony which falls under the two heads of: (1) Experience of the business before the fire; (2) the probable experience thereafter.

As we point out in the independent findings of fact, this warehouse was more or less of a community enterprise backed by the banks and business men of Sumter as well as the board of trade and other county activities. The interest of the banks and others was to build up Sumter as a tobacco market.

The plaintiffs naturally contend that the business was on an up grade, having the backing of the people of Sumter and having the benefit of the community organizations. They also stress very largely the preliminary advertising and contact work which had been done by Mr. Hutchings. From the evidence, therefore, the plaintiffs contend that the "probable experience after the fire" would have been the earning of even larger profits than had been earned during the twelve and one-half days that the warehouse was under actual operation. Under the rosy picture presented, they point out that the $200 a day should be taken as the standard in allowing the recovery.

The defendant's argument points out that the plaintiffs had no such rosy outlook when the fire occurred. They point out that the plaintiffs were having considerable trouble making a go of the warehouse. The difficulties fall under the following heads: (a) A lack of real backing by the banks of Sumter; (b) a loss of confidence on the part of the wealthy men of the city of Sumter in the enterprise; (c) the large amount of tobacco that the warehouse itself had to "buy in"; (d) the small number of buyers on the floor of the warehouse who represented the larger purchasers of tobacco; (e) the fact that there was a general falling off in the prices paid for tobacco during the period between the fire and October 9th.

The court attaches great importance to the experience of the other tobacco markets in South Carolina during this period. This experience is shown by the reports which the warehouses were required to make to the South Carolina department of commerce, industries and agriculture. The testimony of the witness Singletary also furnishes a substantial basis to guide us in ascertaining the history of the tobacco market in South Carolina during the year 1927 from a practical standpoint. This witness has had large experience for a number of years in the tobacco business. He is familiar in a practical way with the different types of tobacco grown in the different sections and with the habits of the farmers in selling their tobacco and of the buyers in making the purchases. The plaintiffs suggest that we should discount Mr. Singletary's testimony because he admits that he had had some financial reverses. We do not follow this argument. The raising and marketing of farm products in the South during the last ten years has been an up and down business. If we adopt the proposition that these who have suffered losses know nothing about the business, we would be forced to call witnesses from another section to testify about the actual experiences of this section. The trend of Mr. Singletary's testimony is in keeping with the actual facts reflected in the reports of all the tobacco warehouses for the year 1927. We know of no better guide in helping us to ascertain the probable experience of the Banner Warehouse in Sumter after the fire than to study the actual experience during the same period of a score of other warehouses located within a radius of seventy-five miles from Sumter. Nor does this court think that the ground work which had been done in order to make the Banner Ware House a popular market during the tobacco season of 1927 would more than offset the fact that the markets of Lake City, Timmonsville, Mullins, and other older markets were larger and better estab-

lished markets to which both farmer and purchaser had been accustomed to resort for many years.

We also have the benefit of the auditors' testimony as presented by auditors representing both sides to this controversy. The plaintiffs make demand for a total sum of $10,-336.16 as reflected in their statement of loss. The plaintiffs further contend that the auditors representing the insurance adjustments had practically agreed upon an amount of recovery in the sum of $6,300. This court does not feel that it is bound by this tentative settlement, and it further points out that, at the time this tentative settlement was suggested, the auditors did not have the benefit of many facts which were thoroughly developed at the trial before the court. The court has gone over all the facts and figures presented by the auditors; and, realizes that it must settle upon some figure which is consistent with the facts developed and with the effect which must be given to the provision in the policy above quoted.

We take the statement of the auditor Hagan as a basis of calculation. We think that his primary figures and method of calculation are well supported by testimony and logic. His final conclusions, however, are confessedly based upon a proposition of fact which we cannot adopt; namely, that the profits of the Banner Warehouse would probably have continued at the rate during the entire period covered by the contract which had been the experience prior to the fire. We think that the testimony shows that the probable experience of this particular warehouse would have been a falling off in the profits for the greater part of the remaining forty business days. Singletary says that the best of the warehouses would show a decrease during September of at least 15 per cent., that 20 per cent. to 25 per cent., would certainly be the experience of the majority of the warehouses. When we take into consideration the situation of the plaintiffs, we are of the opinion that their probable decrease would be even greater. For example, there are three major causes which compel us to discount their chances of continued profits at the same rate: (1) Their financial difficulties; (2) general fall in tobacco prices; (3) the probability that during last days of September and during all of the nine days of October they would have done no business at all, and hence made no profit.

If we attempt to plot a curve of their "probable experience," we must begin on August 25th. The curve would probably rise slightly during the remaining days of August, then drop rapidly after September 2d, and constantly go down to almost nothing towards the end of September. Indeed, we are construing the policy liberally in favor of the insured when we adopt a 33⅓ per cent. reduction as an average for the remaining forty days.

Applying this to Hagan's analysis, we arrive at the following results:

| | |
|---|---|
| Hagan's calculation of probable profits bases on profits continued at same rate | $5,391.50 |
| 33⅓% reduction | 1,797.16 |
| | 3,594.34 |
| Expenses covered by policy (adopting Hagan's figures) | 709.20 |
| Applying 33⅓% reduction to leaf tobacco item | 133.48 |
| Total recovery | $4,437.02 |

With reference to the item of $709.20 allowed as expense, this court points out that this money should be, when recovered from the insurance company, paid by the plaintiffs to the parties to whom it is actually due. For example, the testimony shows that these claims were compromised by the plaintiffs in some instances. This court does not think that either the insurance company or the plaintiffs should profit by the stringency in which these employees holding positions at fixed salaries found themselves. They were employed for a comparatively short time, and the plaintiffs were liable for their entire salaries—the company, under the terms of section 2, was in turn liable to the plaintiffs. Therefore the final order of this court will provide that these items of expense be actually paid by the plaintiffs to the auctioneer and bookkeeper. Of course, the items for insurance and stationery would be properly payable to the plaintiffs themselves. Unless this matter can be settled in this way, this court will take further testimony about the actual facts at a subsequent date and by supplementary order reduce the amount of recovery under the head of expense to that which has actually been paid to the bookkeeper and the auctioneer.

Many arguments as to the elements which should be taken into consideration in fixing the exact amount to be allowed as the recovery are stressed by plaintiffs and defendant alike. Many of these arguments are in the nature of cross-currents, and would lead us into the realm of speculation and sophistry.

We are faced here with the practical matter of doing justice between the parties and not with a problem in sophistry.

Let the plaintiffs' attorneys submit an appropriate order carrying this opinion into effect.

Let the costs of this case accruing after the filing of the remittitur from the Circuit Court of Appeals be taxed against the defendant.