NATIONAL UNION FIRE INS. CO. OF
PITTSBURGH v. ANDERSON–PRICH-
ARD OIL CORPORATION et al.

No. 2699.

Circuit Court of Appeals, Tenth Circuit.

March 3, 1944.

F. A. Rittenhouse, of Oklahoma City, Okl. (John F. Webster, O. R. Rittenhouse, and Arthur Leach, all of Oklahoma City, Okl., on the brief), for appellant.

W. H. Brown, of Oklahoma City, Okl. (J. H. Jarman and Virgil R. Ball, both of Oklahoma City, Okl., on the brief), for appellees.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Effective January 1, 1941, the National Union Fire Insurance Company of Pittsburgh, Pennsylvania, issued and delivered its use and occupancy insurance policy to the Anderson-Prichard Oil Corporation, Anderson-Prichard Refining Corporation, and Anderson-Prichard Pipe Line Corporation "as their interest may appear". By the terms of the policy, the insurer undertook to insure a complete oil refinery against actual loss of net profits, plus fixed and continuing overhead expenses, which the insured refinery is prevented from earning by reason of total or partial suspension caused by fire, together with the expenses necessarily incurred in reducing the loss. In no event, however, could the actual recoverable loss exceed 1/365th of the total coverage of $850,000, or $2,328 for each day of interruption, "due consideration being given to the experience of the business before the fire and the probable experience thereafter"; provided further that the period of interruption or suspension could not exceed the length of time required, with the exercise of due diligence and dispatch, to rebuild, repair or replace the refinery.[1] The policy also contained a "partial suspension" or "honesty" clause, which limited the per diem liability of the company for a partial suspension of the business to the same proportion of the per diem liability which would be incurred by a total suspension of the business for the same period.[2] For appropriate illustration see Kahler

---

[1] "This policy covers, subject to all its terms and conditions, the Use and Occupancy of the property described below:

"The conditions of this contract are that if the building(s) situate at or near Cyril, Oklahoma, and occupied as Refinery Complete and/or machinery and/or equipment and/or raw stock contained therein, be destroyed or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this company shall be liable under this policy for the actual loss sustained, for not exceeding such length of time as would be required with the exercise of due diligence and dispatch, to rebuild, repair or replace such part of the property described as covered by this policy as has been destroyed or damaged, commencing with the date of the fire and not limited by the date of expiration of this policy, to-wit:—

"I. Net profits on the business which is thereby prevented.

"II. Such charges and other expenses as must necessarily continue during a total or partial suspension of business, to the extent only that such charges and expenses would have been earned had no fire occurred;

"III. Such expenses as are necessarily incurred for the purpose of reducing the loss under this policy; for not exceeding, however, the amount by which the loss covered is thereby reduced.

"Total Suspension Clause: The per diem liability under Items I and II of this policy during the time of total suspension of business of all properties described herein shall be limited to the 'Actual Loss Sustained', not exceeding:

"1/365th of the amount of this policy for each business day, if during the period of total suspension, the business would have operated more than six days per week, due consideration being given to the experience of the business before the fire and the probable experience thereafter."

[2] "Partial Suspension Clause: The per diem liability of this company under Items I and II of this policy during the time of a partial suspension of business shall be limited to the 'Actual Loss Sustained' by the insured, not exceeding that proportion of the per diem liability under said items that would have been in-

Business Interruption Insurance, p. 162; and Foster Consequential Coverages, p. 55. See also Hartford Fire Ins. Co. v. Wilson & Toomer Fertilizer Co., 5 Cir., 4 F.2d 835; Firemen's Ins. Co. v. Lasker, 8 Cir., 18 F.2d 375, 379; Studley Box & Lumber Co. v. National Fire Insurance Co., 85 N. H. 96, 154 A. 337, 75 A.L.R. 248; Nusbaum v. Hartford Fire Ins. Co., 276 Pa. 526, 120 A. 481.

The insured sued and recovered a judgment in the sum of $22,546.68 for actual loss of net profits by reason of a partial suspension of the refinery operations, caused by a fire on February 24, 1941. The question presented by this appeal is whether the insured is entitled to recover under the insurance contract, if so the extent, and the factors to be considered in the computation of the loss.

The Anderson-Prichard Refining Corporation and the Anderson-Prichard Pipe Line Corporation are wholly owned subsidiaries of the Anderson-Prichard Oil Corporation. The refining company owns and operates an oil refinery located near Cyril, Oklahoma, which manufactures and sells refined petroleum products; the pipe line company owns and operates a pipeline for the transportation of crude oil which it purchases as a carrier, and which it sells and delivers to the refinery. In the early part of January 1941, the refinery completed a program of expansion and modernization. A new and improved cracking unit, flash tower, and additional storage facilities were installed to be operated in connection with the old equipment which had been in operation for a number of years. These improvements increased the capacity of the refinery from approximately 5,000 barrels to approximately 8,000 barrels daily throughput, and the additional storage facilities enabled the refinery to maintain constant operations by providing storage for the finished products during seasonal depressions of the gasoline market. As a result of these improvements, the refinery planned a program of 7,500 barrels daily throughput for the year 1941, and from January 23 to February 24, 1941, the refinery had an average daily throughput of 8,200 barrels per day.

On February 24, 1941, at about seven o'clock a. m., the newly installed cracking unit was damaged by fire, which necessitated the discontinuance of its operation, and also rendered the flash tower inoperative. The old unit was immediately disconnected or "blinded" off from the damaged cracking unit, and partial operations were resumed after a total suspension of two days. The refinery as improved was one homogeneous unit; the cracking unit and flash tower produced high octane gasoline, and with the discontinuance of the new cracking equipment and flash tower, the production of the plant was curtailed to approximately 5,000 barrels per day. In this impaired condition, the plant was unable to refine all of the charged stock, consequently a part of it was held in reserve storage until full operations could be resumed. For a period of fifteen days, that is, from February 24 to March 11, 1941, the refinery continued to operate in its crippled condition until the damaged parts were repaired and placed in full operation. The parties were unable to agree upon the actual loss recoverable under the policy for the agreed period of partial suspension, and this suit followed.

 The insured is the oil company, the refining company, and the pipe line company, as their interest appears in the risk. The subject of the insurance is one refinery complete; the peril insured against is loss by fire, and the indemnity is the actual loss of business earnings out of which net profits and continuing overhead expenses are paid. The purpose, scope and legal effect of the insurance contract is to protect the prospective earnings of the insured business only to the extent that they would have been earned if no interruption had occurred, not to exceed the per diem limits of the policy. In other words, the policy is designed to do for the insured in the event of business interruption caused by fire, just what the business itself would have done if no interruption had occurred —no more. Hartford Fire Ins. Co. v. Wilson & Toomer Fertilizer Co., supra; Hutchings v. Caledonian Ins. Co., D.C., 52 F.2d 744; Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp., 4 Cir., 64 F.2d 347;

curred by this company by a total suspension of business, which the actual per diem loss sustained under said items during the time of such partial suspension bears to the per diem loss which would have been sustained by the insured under said items by a total suspension of business, for the same time, of all properties described herein, due consideration being given to the experience of the business before the fire and the probable experience thereafter."

Miller v. Hocking Glass Co., 6 Cir., 80 F.2d 436; Goetz v. Hartford Fire Ins. Co., 193 Wis. 638, 215 N.W. 440; National Filtering Oil Co. v. Citizens' Ins. Co., 106 N.Y. 535, 13 N.E. 337, 60 Am.Rep. 473. See also Annotation, 75 A.L.R. 253; Appleman, Insurance Law and Practice, vol. 5, § 3120; Kahler Business Interruption Insurance, p. 49, 50, 137; Foster, Consequential Coverage. The rights and liabilities of the parties are of course measured by the contract of insurance, the terms of which must be judicially interpreted to give practical effect to the manifest intentions of the contracting parties. There is no prescribed formula for the determination of the actual loss of net profits and business expenses covered by the policy, except the test of past experience and probabilities of the future. This test is of course to be applied in a practical way, having regard for the nature of the business and the methods employed in its operation. Hutchings v. Caledonian Ins. Co., supra; Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp., supra; Puget Sound Lumber Co. v. Mechanics' & Traders' Ins. Co., 168 Wash. 46, 10 P.2d 568; Kahler Business Interruption Insurance, p. 173.

■ The operations of the refinery and pipe line companies are largely interrelated and interdependent, and insofar as the pipe line is an integral part of the complete refinery, it should be treated as an integrated whole for the purpose of determining the actual loss sustained under the policy. Studley Box & Lumber Co. v. National Fire Ins. Co., supra; Nusbaum v. Hartford Fire Ins. Co., supra; Puget Sound Lumber Co. v. Mechanics' & Traders' Ins. Co., supra. The proof of loss is based on this principle, and the trial court likewise treated the business as an integrated whole for the purpose of computing the actual loss sustained under the policy. The oil company is interested only as a holding company for the two operating companies,

and its interest in the recovery is governed accordingly.

The insured submitted timely proof of loss of its net profits and continuing expenses during the period of partial suspension, based upon the difference between the earnings of the insured property under a normal fifteen day period, and earnings for the actual operations during the fifteen day partial suspension. For this normal fifteen day period of operations, the insured took the average actual daily throughput of the refinery from January 23rd to August 1, 1941 (exclusive of the partial suspension period), ascertained to be 7,443 barrels daily. The refined or manufactured value of this barrelage, based upon the weighted average of the quoted tank car and tank truck price for the last five days of February and the first ten days of March, was fixed at $176,943.63. The cost of production for the normal fifteen day period was based upon the actual refinery operations for the fifteen days in February next preceding the date of the fire, and on this basis the cost of production was ascertained to be $153,660.55,[3] leaving a net profit for the "normal" fifteen day period of experience before the fire of $23,283.08. The total value of the products actually refined and manufactured during the period of partial suspension, based upon the same weighted average of the quoted tank car and tank truck prices, is shown to be $146,770.72. As against this value, the insured charged the total cost of production in the sum of $146,732.74 (see footnote 3), leaving a net profit for actual operations during the suspension period of $37.98. Similar schedules were submitted on behalf of the pipe line company, showing a loss of net profits in the sum of $604.95, and this item is not in dispute.

As a part of the cost of production for the partial suspension period, the insured charged the same manufacturing expense (exclusive of material costs) in the sum of

| 3 | Normal 15 day period | Suspension period |
|---|---|---|
| Crude oil to stills | $112,344.34 | $ 76,188.78 |
| Natural gaso. blended | 4,357.79 | 4,393.17 |
| Products of reserve stock processed | 7,100.19 | 36,292.56 |
| Other mf'g expenses | 19,353.58 | 19,353.58 |
| Bulk plant expenses | 285.60 | 285.60 |
| General overhead | 10,219.05 | 10,219.05 |
| | $153,660.55 | $146,732.74 |
| And for the Pipe Line Company: | | |
| Operating expense | 741.64 | 713.43 |
| General overhead | 447.15 | 397.85 |

$19,353.58, and the same general overhead expenses in the amount of $10,219.05, as that incurred during a normal fifteen day period on the theory that these expenses remained constant during the partial suspension period.

With minor exceptions and differences, which do not materially affect the legal or accounting principles involved, the trial court accepted and adopted the theory as well as the calculations and computations used by the insured in its submitted proof of loss. The trial court applied the practical test of experience by adopting the earnings for the normal fifteen day period of operations and adjusting it to the earnings for the actual operations during the fifteen day suspension period. Based upon a normal fifteen day period of operation, the trial court found that the insured business would have normally earned "all of its expenses and produced a net profit at least in the amount claimed by the plaintiff and here determined to be $24,000.00", or $1,600 per day. On this same basis, the court further found that the fixed and continuing expenses of the business for a normal fifteen day period were approximately $11,000, or $733 per day, and in that respect it substantially confirmed the computations contained in the submitted proof of loss, on the theory that the continuing overhead expenses remained substantially constant during the period of partial suspension, and were therefore correctly computed on that basis. The court concluded that the total recoverable loss for a total suspension period of fifteen days would have been $35,000 or $2,333 per day, which substantially conforms to the computations submitted in the proof of loss, and also compares favorably with the insurance value of the business as estimated by the parties when the risk was assumed, and the premiums paid.

On a basis of the actual operations for the fifteen day suspension as reflected by the computations in the submitted proof of loss (see footnote 3), the trial court found that the insured business earned its continuing overhead expenses and a net profit in the sum of $1,405.58. Consequently, the actual recoverable loss for the suspension period was the "normal earnings" of $24,-000, less the actual earnings of $1,405.58, or $22,594.42, including the claim for $604.95 attributable to the pipe line company which was not contested, and which when subtracted from the total amount recoverable left a balance of $21,941.73 for which judgment was entered.

The appellant does not challenge the correctness of the computations of the trial court in arriving at its conclusions, but it does challenge the factors which entered into the determination of the actual loss sustained. It is contended that the value of the manufactured products should not be computed on a basis of the weighted average of the quoted tank car and tank truck prices as submitted in the proof of loss, and accepted by the trial court. Rather it is maintained that only the tank car prices should have been used for the purposes of valuation since the so-called truck prices are in reality bulk station and not manufacturer's prices. The evidence shows that about two-thirds of the manufactured products are sold in tank cars at prevailing tank car prices, and a part of the finished products are sold to trucks at truck sales prices. The tank car sales are loaded at the refinery, and the truck sales are loaded at the loading dock maintained at the refinery for that purpose, and it is sometimes conveniently called the bulk station plant. The truck sales prices were slightly higher than the tank car prices, but in each instance the sale was a manufacturer's sale at manufacturer's prices, and the trial court did not err in accepting the weighted average of the two for the purpose of computing refined and manufactured value.

In the "normal" fifteen day period of operation, the refinery used 301,747 gallons of gasoline, sometimes called "400" and "430" gasoline, as a "blend" in the manufacture of higher grade products. This gasoline was included in the manufacturing cost for the fifteen day period at its manufacturer's price in the sum of $7,-001.19. During the period of partial suspension, the refinery used 951,636 gallons of this same type of gasoline for blending purposes, and on the basis of the same manufactured price, was valued at $36,-292.56 for the purpose of computing the manufacturing cost. The appellant maintains that in computing the cost of production for the purpose of determining the actual loss sustained, this gasoline should have been included at its actual cost of manufacture and not at its manufactured sales price, thus reducing the manufacturing cost for the period of partial suspension by the relative difference in the amount of gasoline used for blending purposes dur-

ing the respective periods. The evidence shows that although this gasoline was used as a blending fluid in the processing of high octane products, it was also adaptable for commercial use and was sold in great quantities as a finished product. The manufacturer's profit is realized as, if, and when its products are manufactured, and not when such products are sold, and such profit is ascertained on the basis of the prevailing market prices when the products are manufactured. See Kahler Business Interruption Insurance, p. 148; Foster Consequential Coverages p. 143. Cf. Patapsco Ins. Co. v. Coulter, 28 U.S. 222, 3 Pet. 222, 7 L.Ed. 659; Standard Marine Ins. Co. v. Scottish Metropolitan Assurance Co., 283 U.S. 284, 51 S.Ct. 371, 75 L.Ed. 1037.

It follows therefore that the insured's profit in this manufactured product was realized when it was manufactured, and it should not be required to sacrifice this profit in order to minimize the actual loss under its insurance contract. If the insured had been required to purchase this necessary blending fluid on the open market for the purpose of operating the refinery in its crippled condition, its purchase price would have been properly includable in the cost of production, and because it was furnished out of its own reserve stock does not change or alter its value in determining the cost of production. The bona fides of the apparent disproportionate use of this blending stock during the partial suspension period is also challenged, but the trial court found that its use in such quantities was necessary to the efficient operation of the refinery in its crippled condition during the suspension period, and there is no evidence that it was not used in good faith for the purpose of maintaining the maximum efficiency of the plant. It is certainly not for this court to say whether the insured operated the plant efficiently and economically so long as its operations were in good faith.

■ It is also charged that certain items of labor costs which were paid as a part of the property loss under another policy with the insurer were also charged as a part of the operating expenses for the period of partial suspension, thereby increasing the recoverable loss of profits to the extent of $4,879.44, but there is no evidence in the record to support this accusation. The record does show that these labor items were charged to a special account, paid as a part of the property loss, and were not charged as a part of the operating expenses during the period of partial suspension. The trial court did disallow an item of $1,152.14 submitted in the proof of loss, which was paid to the insured's employees for supervising the work of rebuilding the plant. This item was properly disallowed on the grounds that it had been paid by the insurer as a part of the property loss. Other items included in the trial court's computation are challenged, but they relate primarily to principles of accounting employed, which the trial court considered, and we think properly rejected.

■ The appellant finally contends that the loss of profits actually sustained and recoverable under the policy should have been computed upon the difference of the per barrel cost of production during the period of partial suspension, and the normal period of operations, rather than upon the per diem basis accepted and followed by the trial court. In that respect, it is sufficient to say that the policy of insurance was not written, nor the premiums paid on that basis, and such a method of calculation is not adaptable to the test of experience in the determination of the loss of net profits under the contract. The judgment of the court is of course but an estimate or forecast of the earnings of the insured business if no fire had occurred; its conclusions may be incorrect in some detail, but they bear a reasonable relationship to the contract between the parties and the practical operation of the insured business.

The judgment of the trial court is not clearly erroneous. On the other hand, it is amply supported by the record and is affirmed.