360 F.2d 531
 NORTHWESTERN STATES PORTLAND CEMENT COMPANY, Appellant,
v.
HARTFORD FIRE INSURANCE COMPANY, the American Insurance
Company, the Home Insurance Company, Insurance Company
of North America, Royal Insurance Company, Limited, New
Hampshire Insurance Company, Sprigfield Fire and Marine
Insurance Company, a/k/a Springfield Insurance Company and
American Central Insurance Company, Appellees.
 No. 18185.
 United States Court of Appeals Eighth Circuit.
 May 13, 1966.
 
 1
 Robert H. Shepard, of Shepard & Shepard, Mason City, Iowa, and Peter Dorsey, of Dorsey, Owen, Marquart, Windhorst & West, Minneapolis, Minn., for appellant.
 
 
 2
 John P. Gorman, of Clausen, Hirsh, Miller & Gorman, Chicago, Ill., made argument for appellees and filed brief with Jacob T. Pincus, Chicago, Ill., and Don W. Burington, of Westfall, Laird & Burington, Mason City, Iowa.
 
 
 3
 Before MATTHES and GIBSON, Circuit Judges and HUNTER, District Judge.
 
 
 4
 ELMO B. HUNTER, District judge.
 
 
 5
 Presented on this appeal is the question of the proper interpretation of those portions of certain fire insurance policies concerning loss from business interruption, and the question of when interest on the sum owed should commence.
 
 
 6
 Northwestern States Portland Cement Company, as plaintiff, brought suit against eight insurance companies under eight identical business interruption policies issued by the respective defendants, for loss resulting from a hostile fire at its cement manufacturing plant.[1] As a direct result of the fire a part of plaintiff's manufacturing facilities were closed down for a thirty-three day period. Plaintiff sued to recover the value of its lost production less noncontinuing expenses. The insurance companies admitted liability but resisted plaintiff's suit, claiming their liability is limited to such expense, in excess of normal, as plaintiff would have incurred in replacing finished stock used by it in reducing its loss as a result of the partial shutdown. The judgment of the trial court, including the award of interest from the date of the filing of the complaint, was in accord with the insurance companies' theory of the case. This appeal followed.
 
 
 7
 Some examination of plaintiff's business operation in necessary to an understanding of the parties' contentions and the trial court's ju gment. There are three basic steps in the manufacture of cement; namely, (1) quarrying, crushing and blending limestone with clay; (2) heating the blended mixture of powdered limestone and powdered clay in a rotary kiln where a chemical reaction occurs resulting in a product known as clinker (clinker is a commodity which was not bought or sold and has no ascertainable market price); and (3) grinding clinker to the required degree of fineness and inserting additives, principally gypsum, to complete the manufacturing process.
 
 
 8
 Plaintiff operates two adjacent cement manufacturing plants in Mason City, Iowa. On July 12, 1962, in Plant No. 2 a hostile fire commenced in and destroyed the induction draft fan located there, rendering the four hundred foot long kiln of Plant No. 2 inoperable until noon of August 14, 1962.
 
 
 9
 Prior to the fire the kilns in both Plant No. 1 and Plant No. 2 ordinarily were operated continuously twenty-four hours per day for seven days each week. By reason of the thirty-three day partial shutdown of Plant No. 2 caused by the loss of operation of its kiln, plaintiff suffered an actual loss of production of 115,242 barrels of clinker, which, when properly ground and combined with the proper amount of gupsum, would have produced at that plant 120,044 barrels of cement, the finished product. In the Court below plaintiff unsuccessfully contended the policies' words 'actual loss sustained' by it was the value of this lost production less nonincurred expenses There being no readily ascertainable market price for clinker, plaintiff contends the proper measure of damages is the net sales price of finished cement ($3.71) multiplied by the production lost during the interruption period, converted to barrels of finished cement ($3.71 X 120,044) reduced by costs of raw materials, fuel, power, finish, grinding, cooling and storage and portions of repairs and depreciation at Plant No. 2 which did not continue during the shutdown period and by total costs of that portion of Plant No. 2 that fully operated during the shutdown period. The parties agree that under plaintiff's theory of the case, and after applying reductions required by co-insurance clauses, this loss amounted to $118,029.83.
 
 
 10
 However, plaintiff did not sustain any loss of sales as a result of the kiln in Plant No. 2 being inoperable for the thirty-three days because at the time of the fire plaintiff had on hand a large inventory of finished cement, and also substantial amount of stockpiled clinker which it continued to use in the grind department of Plant No. 2, which department was thereby enabled to operate during the shutdown period. Specifically, defendants contend the proper measure of damages is the expense in excess of normal that plaintiff would (and did) incur in replacing any finished stock used by it to reduce the loss. It is agreed that such excess cost incurred in replacing the 120,044 barrels of cement at the older and less efficient Plant No. 1 after the interruption period was terminated was $32,123.33.[2]
 
 
 11
 The parties also agree that plaintiff should be reimbursed for expediting expense the sum of $2,874.67 in addition to whatever other sum plaintiff is entitled to receive.
 
 
 12
 In concurring with defendants' theory of the case that the actual loss incurred by plaintiff within the meaning of the policies was the excess cost required to manufacture cement at the less efficient facilities ($32,123.33) the trial court allowed that sum plus the expediting expense ($2,874.67) for a total judgment of $34,998.00 with interest from December 21, 1962, the date of the filing of the petition.
 
 
 13
 On this appeal plaintiff's principal contention is that the trial court erred in failing to find that its loss under the insurance policies consisted of the value of the clinker (reduced by noncontinuing production expenses) which would have been produced in the kiln at Plant No. 2 had the kiln not been shut down for thirty-three days by a hostile fire. In contending that its 'actual loss sustained' is the value of lost production less noncontinuing expenses plaintiff reasons that its business is the production and the sale of cement; that as a result of the fire it lost production, not sales, and that under the language of the policy both production and sales are insured. Plaintiff suggests that in any event the policy provisions 'actual loss sustained' are not defined and have not been defined since a policy revision in 1945; are ambiguous; and therefore the insured's interpretation must prevail. Thus, plaintiff urges that it be compensated for the value of lost clinker production less noncontinuing costs.
 
 
 14
 However, we are persuaded that the district court did not err in finding that the purpose and intent of the policy provisions are to insure against loss of earnings, and that if there is no loss of earnings, liability is limited to the extra expense necessary to prevent loss of earnings.
 
 
 15
 The governing portions of the eight insurance policies include what is known as Business Interruption Form No. 4. The provisions of this form are the focal point of the present controversy and we proceed to discuss them.
 
 
 16
 Paragraph 1 makes it clear that the policies are not fire insurance policies that provide for the reimbursement for specific property destroyed by fire.[3] Rather, it states 'This policy covers only against loss resulting directly from necessary interruption of business, caused by damage to or destruction of real or personal property, except finished stock.' It is readily apparent, as we will endeavor to explain, that the loss mentioned is actual loss of earnings resulting from the interruption of the insured's business caused by the perils insured against. That this is so is consistent with the basic object for which such a business is ordinarily conducted, viz., to realize earnings from the operation of the business. In numberous cases and text authorities it has been stated, and we think correctly, that the essential nature and purpose of business interruption insurance generally is to protect the earnings which the insured would have enjoyed had there been no interruption of the business. Rogers v. American Insurance Company et al., 338 F.2d 240 (8th Cir., 1964); Fidelity-Phenix Fire Insurance Co. of New York v. Benedict Coal Corp., 64 F.2d 347, 352 (4th Cir., 1933); National Union Fire Ins. Co. of Pittsburgh v. Anderson-Prichard Oil Corp., 141 F.2d 443, 445 (10th Cir., 1944); Quality Molding Company v. American National Fire Insurance Company, 272 F.2d 779 (7th Cir., 1959); 44 C.J.S. Insurance 48; Annotation, 83 A.L.R.2d 885. Appleman, Insurance Law and Practice, Vol. 5, Sec. 3120.
 
 
 17
 According to Paragraph 2 it is the actual loss sustained resulting directly from the interruption of business not exceeding the gross earnings that is to be compensated for, and hence, not the value of any particular intermediate product used in the manufacturing process such as clinker. The insured, among other things, under Paragraph 2(a) of the From 4, is confined to the actual loss sustained 'for only such * * * time as would be required * * * to rebuild, repair, or replace such part of the property * * * as has been damaged or destroyed.'
 
 
 18
 Under the terms of Paragraph 3 the insured is not permitted to sit idly by during a business interruption but must take affirmative action to reduce the loss of earnings. It must reduce the loss resulting from the interruption of business, if possible, by partial or complete resumption of the business; by making use of other property at the location; by making use of stock, raw, in process or finished. Such reduction is to be taken into account in arriving at the amount of loss. How it is to be taken into account is the subject of Paragraph 4.
 
 
 19
 It is clear that there would have been a loss of sales (income) except that plaintiff took the steps required of it by Paragraph 3 to reduce, and in fact to prevent, any loss of sales from occurring. Thus, the actual loss sustained by plaintiff was its loss of stock used to prevent loss of sales and thereby protect its earnings which would result in the normal uninterrupted operation of the business. The policies specifically state what is to be paid an insured for taking these required steps to prevent loss. Paragraph 4 provides the insured is to be compensated therefor by receiving such expenses, in excess of normal, as would necessarily be incurred in replacing any finished stock used to reduce the loss. This is precisely what the trial court held plaintiff was entitled to received and we think correctly so.
 
 
 20
 In National Union Fire Insurance Company of Pittsburgh v. Anderson-Prichard Oil Corp., 141 F.2d 443, 445 (10th Cir., 1944), cited by the plaintiff, in speaking of business interruption insurance the Court stated, '* * * the policy is designed to do for the insured in the event of business interruption caused by fire, just what the business itself would have done if no interruption had occurred-- no more.' Plaintiff's present contention, if successful, would do more than make it whole for the loss actually sustained as a result of the business interruption. If allowed the $118,029.83 claimed, being the gross profit (differential between the sales price of finished cement and the insured's cost), the insured having suffered no loss of sales or earnings as a result of the shutdown would be in a better position than if no shutdown had occurred. We do not believe such a result was intended or provided for in the insurance contract.
 
 
 21
 The substantive law of Iowa, which is controlling on the question before us, is in accord with the usual rule that where the language of an insurance policy is not ambiguous there is no need to resort to rules of construction. See, Aeroline Flight Service v. Insurance Co. of North America, 133 N.W.2d 80 (Iowa, 1965); Iowa Electric Co. v. Home Insurance Co., 235 Iowa 672, 17 N.W.2d 414. The trial court's holding that the pertinent language of the insurance policies is not ambiguous is in accord with the law of Iowa as well as being consistent with the customary view taken of such policy language. See, Rogers v. American Insurance Company, 338 F.2d 240 (8th Cir., 1964); Annotation, 83 A.L.R.2d 885, 896.
 
 
 22
 Plaintiff suggests error in the computation of its damages or loss occurring in July and August, 1962, on the basis of the amount by which production costs in Plant No. 1 late in the fall of 1962 when additional facilities became available would have exceeded production costs at Plant No. 2, where no additional facilities ever became available. Plaintiff queries how long after the interruption period must the insured make available its facilities to replace finished stock. Plaintiff apparently has overlooked that portion of Paragraph 4 of From No. 4 which provides coverage for such expenses as are necessarily incurred for the purpose of reducing loss, 'and such expenses, in excess of normal, as would necessarily be incurred in replacing any finished stock used by the Insured to reduce loss under this policy.' The italicized language does not require the insured to have actually incurred the expense in replacing the mentioned stock. The amount of such expense could not be known until after the shutdown period for until then it usually would not be known how much of its reserve stock of finished cement insured would need to use to meet its sales and thus reduce loss under the policy. At the end of the shutdown period such expenses in excess of normal should be calculable, whether insured went ahead and incurred them or not. In the present case the insured did actually incur these expenses in an amount to which the parties have stipulated, and we find no merit in plaintiff's suggestion of lack of available methods in the policy to determine with any degree of accuracy the amount of such expenses.
 
 
 23
 Finally, plaintiff contends that by the specific policy terms, the sums owing were due and payable 60 days after filing proofs of loss on September 5, 1962,-- i.e., November 5, 1962, and that interest is due from this date rather than from the date of the filing of the Petition on December 12, 1962.[4]
 
 
 24
 The eight insurance policies are Iowa contracts, and are governed by Iowa Law. The question of when the interest should commence in a somewhat comparable situation arising under Iowa law has been previously considered and decided by this court in Aetna Insurance Company v. Barnett Brothers, Inc.,289 F.2d 30 (8th Cir., 1961). We there referred to the 1958 Code of Iowa, I.C.A., which concerns rate of interest in cases of (1) money due by express contract and (2) money after the same becomes due. We concluded that where the amounts of loss for which the insurer is liable under the terms of the policy wes payable sixty days after proof of loss is received, that under the latest controlling Iowa decision, Glandon v. Farmers' Mutual Hail Ins. Assoc. of Iowa, 1930, 211 Iowa 60, 232 N.W. 804, 806, the insureds were entitled to have interest computed at five percent on the amount of the verdict from the dates sixty days after proofs of loss were received by the companies.
 
 
 25
 Iowa for many years has allowed interest to be computed on unliquidated claims where the damage was complete at a particular time. Collins v. Gleason Coal Co., 140 Iowa 114, 115 N.W. 497, 118 N.W. 36, 18 L.R.A.,N.S., 736 (1908); Banks v. Carrell, 241 Iowa 786, 43 N.W.2d 142 (1950); United States v. Employers Mutual Casualty Company, 226 F.2d 895 (8th Cir., Iowa, 1955). We are convinced the District Court clearly erred in its finding that the interest was not to commence until the petition was filed. The district court's judgment should be and is hereby amended as to the interest award to provide that interest commence on November 5, 1962, which date is sixty days after the filing of the proofs of loss.
 
 
 26
 The district court's judgment, as modified in its interest award, is affirmed.
 
 
 
 [1]
 Count I of the petition, not pertinent to this appeal except for jurisdictional allegations, involved a claim for damages arising under fire insurance policies issued by the defendants on plaintiff's property. After payment by defendants to plaintiff of this claim, the Count was dismissed with prejudice
 
 
 [2]
 The stipulation provided, '* * * said expenses in excess of normal being based upon the difference in cost between production in Plant No. 1 and Plant No. 2. * * * Plant No. 2 was not available for such replacement at any time and Plant No. 1 did not become available until September 1, 1962, at which time the six 110 foot kilns in Plant No. 1 became available.'
 
 
 [3]
 Cf. Puget Sound Lumber Co. v. Mechanics' & Traders' Ins. Co., 168 Wash. 46, 10 P.2d 568, 570: '* * * It must be remembered that this is not an action upon the usual policy of fire insurance. It is true that the loss for which recovery is sought was occasioned by a fire, but the policies of insurance cover only earnings which might have accrued to the insured had the operation of its plant been uninterrupted by such a calamity; no tangible property being covered.'
 
 
 [4]
 The policy provided: 'When loss payable: The amount of loss for which the company may be liable shall be payable 60 days after proof of loss, as herein provided, is received by this company and ascertainment of the loss is made either by agreement between the insured and this company expressed in writing or by filing with this company of an award as herein provided.'
 Proof of loss was filed by plaintiff on September 5, 1962, and liability was denied by all insurers. On November 14, 1962, plaintiff submitted additional proof to sustain its theory of a hostile fire and after consideration thereof and based thereon the insurance companies changed their position in about January of February 1963 and admitted a hostil fire. Their original denial of all liability is conceded to have been made in good faith.