METALMASTERS OF MINNEAPOLIS, INC., Appellant,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Respondent.

No. C2–90–812.

Court of Appeals of Minnesota.

Oct. 23, 1990.

Review Denied Dec. 20, 1990.

David K. Hackley, Minneapolis, for appellant.

Michael S. Kreidler, Stich, Angell, Kreidler & Muth, P.A., Minneapolis, for respondent.

Considered and decided by DAVIES, P.J., and PARKER, and LANSING, JJ.

## OPINION

PARKER, Judge.

Metalmasters of Minneapolis, Inc., appeals from the trial court's judgment, order denying a new trial, and order granting partial summary judgment. Liberty Mutual Insurance Company seeks review. We affirm in part, reverse in part and remand.

### FACTS

Metalmasters manufactures precision computer disk drives and other small machine parts. Liberty sold Metalmasters a comprehensive general liability insurance policy providing up to $1,400,000 coverage. The policy included business interruption coverage.[1] Metalmasters has paid all premiums due.

A two-inch overhead pipe carrying water for cooling and air conditioning ruptured during the night of February 26, 1987. The water flooded Metalmasters' shop. Some of the items destroyed included engineering drawings and automated machinery backup tapes owned by Metalmasters and certain aircraft manuals owned by another entity. The water damage caused Metalmasters to shut down production for nine weeks, with partial production resuming after three weeks.

Metalmasters controls the temperature, humidity and dust in its clean rooms, in which it manufactures RSD spindle assemblies, a computer memory storage device. Metalmasters began using its clean rooms within four months after the water damage, but in order to produce a rust-free product, Metalmasters necessarily incurred an additional expense of $4.90 for each of 15,500 spindle assemblies, totaling $75,590.

Before the rupture, Magnetic Peripherals, Inc. ("MPI") bought spindle assemblies exclusively from Metalmasters. At the time of the rupture MPI had ordered 10,500 spindle assembly units. Metalmasters filled this order with salvaged finished spindle assemblies and pieces. Metalmaster met all of MPI's orders during the business interruption.

The parties appeal the trial court's conclusions concerning aircraft manuals owned by another, business interruption losses, engineering drawings, automated machinery backup tapes, and prejudgment interest.

### ISSUES

1. Is Metalmasters entitled to recover $193,500 under business interruption coverage when it suffered no loss of sales?

2. Is Metalmasters entitled to recover $60,000 under business interruption coverage for the lost value of the services of its president, John Sandberg?

3. Is Metalmasters entitled to recover $75,950 for its additional expenses to correct product rust problems resulting after the water pipe rupture?

---

1. Although this coverage is entitled "Gross Earnings Endorsement" and is labeled "Form MP 15 90 07 77," we refer to this endorsement as business interruption coverage because we think the title is a misnomer, as the analysis below indicates. In *Associated Photographers v. Aetna Casualty & Surety*, 677 F.2d 1251, 1253 (8th Cir.1982), the Eighth Circuit refers to a similar endorsement as "business interruption insurance;" we accept their characterization.

4. Is Metalmasters fully covered under the Special Multiperil Policy (MP 00 14) for damage to aircraft manuals owned by JRS Enterprises?

5. Is Metalmasters fully covered under MP 00 14 for damage to its engineering drawings?

6. Is Metalmasters entitled to recover for damage to automated machinery back-up tapes under MP 00. 14?

7. Is Metalmasters entitled to prejudgment interest on the judgment under Minn. Stat. § 549.09 from the date the action commenced?

## DISCUSSION

Factual findings made by a trial court "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Minn.R. Civ.P. 52.01. As to conclusions of law, this court need not defer to those drawn by the trial court. *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 354 (Minn. 1978). "The interpretation and construction of an insurance policy is a matter of law." *State Farm Mutual Auto Insurance v. Budget Rent–A–Car Systems, Inc.*, 359 N.W.2d 673, 675 (Minn.App.1984).

Two parts of the insurance policy, the business interruption coverage (MP 15 90 07 77) and the Multiperil Personal Property Endorsement (MP 00 14), address the coverage claims raised on appeal. Minn.Stat. § 549.09 governs prejudgment interest.

## I

Metalmasters claims it suffered an actual loss of $193,500, the value of its weekly net sales ($21,500) multiplied by nine weeks of interrupted production. The trial court denied Metalmasters' claim for this business interruption loss:

> Plaintiff suffered no decrease in gross earnings as a result of the accident because it realized no loss of sales by meeting all customer requests. Thus, it suffered no business interruption loss as defined by the Gross Earnings Endorsement.

Metalmasters argues the trial court erred by equating earnings with sales. Liberty argues that the trial court found as a factual matter that Metalmasters proved no actual loss of earnings.

The "gross earnings" endorsement "insure[s] against loss resulting directly from necessary interruption of business caused by the perils * * * damaging or destroying * * * real or personal property * * * at the premises." Under this endorsement Liberty is liable for the "actual loss sustained by the insured."

The amount of the insured's actual loss under Part II of this endorsement shall not exceed "the reduction in gross earnings less charges and expenses which do not necessarily continue during the interruption of business * * *." This endorsement also limits the time for recovering actual loss:

> [F]or only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed commencing with the date of such damage or destruction and not limited by the date of expiration of this policy.

As a final consideration to an actual loss resulting from necessary interruption of business, the policy states:

> Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the insured with the same quality of service which existed immediately preceding the loss.

In *National Union Fire Insurance Co. v. Anderson–Prichard Oil Corp.*, 141 F.2d 443, 445 (10th Cir.1944), the court defined the purpose of business interruption insurance:

> The purpose, scope and legal effect of the insurance contract is to protect the prospective earnings of the insured business only to the extent that they would have been earned if no interruption had occurred, not to exceed the per diem lim-

its of the policy. In other words, the policy is designed to do for the insured in the event of business interruption caused by fire, just what the business itself would have done if no interruption had occurred—no more.

In *Associated Photographers, Inc. v. Aetna Casualty & Surety Co.*, 677 F.2d 1251 (8th Cir.1982), the court interpreted a similar business interruption policy when it analyzed the jury instruction. The trial court instructed the jury:

> [A]ctual loss of earnings means the difference between the net profit you find plaintiff would have earned during the period of interruption and the net profit you find plaintiff did earn during the period of interruption.

*Associated Photographers*, 677 F.2d at 1254. The Eighth Circuit held:

> [T]he trial court's instruction is proper here since the difference in net profits using the figures in the exhibit of Aetna is equivalent to the reduction in gross earnings minus noncontinuing expenses. The court's instruction merely simplified the calculations the jury would be required to perform as it determined the amount of business interruption loss sustained by Associated. The language of the instruction is equivalent to the language in the policy.

*Associated Photographers*, 677 F.2d at 1255–56 (footnote omitted).

■ The trial court determined that Metalmasters incurred no "actual loss" from the business interruption.

Evidence presented at trial supports this finding. Metalmasters did not present evidence of lost sales; instead, it relies on the assertion, "Sales employees did not sell, and production employees did not produce." Gross earnings can be reduced without sales being lost, e.g., where necessary to reduce price in order to maintain sales. Metalmasters proved no such reductions. Gross earnings is a coverage cap. The real question is one of actual loss. Metalmasters had no actual loss.

Unless the factfinder were, upon sufficient evidence, to determine that Metalmasters' prospective earnings exceeded the actual earnings during the interruption, Metalmasters could not recover $193,500 as loss of gross earnings. *See National Union Fire Ins. Co.*, 141 F.2d at 445. Finding that Metalmasters suffered no loss of sales, the trial court ruled that Metalmasters' prospective earnings did not exceed its actual earnings. We affirm.

## II

■ John Sandberg, Metalmasters' president, spent four months helping clean up water damage. Metalmasters claims the gross earnings endorsement entitles it to $60,000 of coverage for the value of Sandberg's services, which otherwise could have been used to the advantage of the corporation.

The trial court denied Metalmasters' request for coverage of the value of Sandberg's services: "[T]he value of Mr. Sandberg's services are not compensable because Plaintiff has suffered no loss as a result." We agree with the trial court that without a proven actual loss, the business interruption coverage does not extend to the value of Sandberg's services.

## III

■ The trial court granted Metalmasters' claim for business interruption loss of $75,950 for additional expenses necessary to prevent loss of sales after the accident. The trial court reasoned:

> It is patently unfair to ask [Metalmasters] to resume operations in this situation, where the building was in Defendant's control, and not allow Plaintiff to recover for the new expenses created by Defendant's action.

As stated by the trial court, "If [Metalmasters] refused to use the 'wet' clean rooms, it could be 'docked' for not trying to mitigate its loss."

Since the trial court found "that the humidity problem is a direct result of the ruptured filter and water damage here," the additional production expense resulted from the water damage. Thus, the business interruption coverage extends to the

additional rust prevention expense of $75,-590 as an actual loss.

■ These additional production expenses were expenses of mitigation. Liberty cannot have it both ways. If, as they strenuously urge, the insured has a contractual as well as a common law duty to mitigate damages, then the expenses of that mitigation must be covered. If the mitigation efforts take longer than the interruption period, then the business interruption clause cannot limit coverage to that period, since the activity is in the interest of the insurer. In this case the expense continued beyond the four weeks during which the clean rooms were inoperable.

■ Mitigation is a duty the insured performs for the insurer's benefit. Mitigation cost is recoverable so long as it is reasonable and less than the damages would have been without it. In this case the cost of mitigation is unquestionably less than damages would have been without the additional production expense. We agree with the trial court's analysis as to this issue and affirm.

## IV

The water from the rupture destroyed several aircraft manuals owned by JRS Enterprises, Inc., or John Sandberg as an individual. Metalmasters stored the manuals for JRS Enterprises, which occupied the rear portion of Metalmasters' building.

In a pretrial order the trial court concluded that the Special Multiperil Policy, form MP 00 14, provided for $2,000 of coverage for personal property owned by another and limited Liberty's liability to that amount.

MP 00 14 provides coverage for "personal property belonging to others in the care, custody or control of the insured while * * * in * * * the building." This endorsement also limits coverage of certain property unless "specified perils" caused the loss. "Specified perils" means

　　direct loss by fire, lightning, aircraft, explosion, riot, civil commotion, smoke, vehicles, windstorm or hail to property contained in any building, vandalism and malicious mischief, *leakage or* accidental discharge from automatic fire protective systems.

(Emphasis added).

■ Metalmasters argues that water pipe rupture constitutes leakage, a separately specified peril. Liberty argues that leakage refers solely to automatic fire protective systems and is not, by itself, a specified peril but is covered only if the leak is in a sprinkler system.

If the phrase "from automatic fire protective systems" modifies the word "leakage," then no conjunction links this term and its modifier to the series of items defining specified perils; this construction would be grammatically incorrect. Other series of terms in MP 00 14 omit the comma before the conjunction: for example, Part V, paragraph D, states, "The insured may apply up to $1,000 to cover outdoor trees, *shrubs and* plants" (emphasis added). Thus, the policy, in omitting a conjunction before the word "leakage," must be read to make leakage a separate item.

Leakage, as a peril separate from and in addition to "accidental discharge from automatic fire protective systems," is fully covered under MP 00 14, subject to no limitation under Part IV.

■ Assuming that our analysis of punctuation and grammatical usage is not compelling, we believe that whether "leakage" constitutes a separate peril presents *at least* an ambiguity. Any ambiguity should be construed in favor of the insured and against the insurer. *Western World Insurance Co. v. Hall*, 353 N.W.2d 221, 223 (Minn.App.1984). Leakage must therefore be construed as a separate peril not subject to the additional limitations of MP 00 14 Part IV.

■ MP 00 14 further provides coverage for personal property of others in Part V, Extensions of Coverage, which apply "as an additional amount of insurance." As to nonowned personal property, the policy provides the following extension of coverage:

　　The insured may apply at each location up to 2% of the limit of liability specified

for Personal Property of the insured at such location, but not exceeding $2,000, *as an additional amount of insurance,* to cover for the account of the owners thereof (other than the named insured) direct loss by a peril insured against to personal property, similar to that covered by this policy, belonging to others while in the care, custody or control of the named insured and all while (1) in or on the buildings(s), or (2) in the open (including within vehicles) on or within 100 feet of the designated premises.

(Emphasis supplied). Because Part V provides additional coverage, the total coverage available under the policy for damage to personal property of others by a specified peril is $1,402,000.

We reverse the trial court's decision limiting coverage of the aircraft manuals to $2,000 and remand for determination of value of the aircraft manuals under the category of personal property of others.

## V

Water damage destroyed Metalmasters' engineering drawings. The trial court held that the policy does not cover the drawings because they were not damaged from a "specified peril."

MP 00 14 Part I provides coverage for "[b]usiness personal property owned by the insured and usual to the occupancy of the insured." Under Part IV, valuable papers, including drawings, are covered only against loss caused by the "specified perils."

Because, as discussed above, the water damage in this case was caused by the specified peril (leakage), the policy covers the engineering drawings to the policy limits, with an additional $500 of coverage available under Part V, extensions of coverage, for total coverage of $1,400,500 available for valuable papers. As with the aircraft manuals, we reverse the trial judge and, since he did not determine the value of the engineering drawings, we remand to the trial court for that purpose.

## VI

■ Water damaged backup tapes for automated machinery which directed the cutting heads for its spindle assemblies. The trial court granted Metalmasters' claim for full coverage for its loss of backup tapes:

Plaintiff suffered a loss of $40,000 to its automated machinery back-up tapes. Defendant has paid $20,000 toward this claim, which represents the limits of coverage available under the electronic data processing endorsement. Therefore, Plaintiff's claim for the uncompensated personal property loss of $20,000 is granted.

The backup tapes are personal property lost by Metalmasters. MP 00 14 Part IV(2) defines valuable papers and records to include computer programs and ·other records including film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing. A specified peril damaged the backup tapes; MP 00 14 Part V provides additional coverage for valuable papers. Thus, the total maximum coverage available for damage to valuable papers, including backup tapes, is $1,400,500. We affirm the trial court's award of the uncompensated $20,000 for destruction of the backup tapes.

## VII

■ Minn.Stat. § 549.09 (1988) allows prejudgment interest in most cases. *See Solid Gold Realty, Inc. v. Mondry,* 399 N.W.2d 681, 683 (Minn.App.1987). The statute allows preverdict interest from the commencement of the action when no written settlement demand precedes the commencement. Minn.Stat. § 549.09, subd. 1(b); *Solid Gold,* 399 N.W.2d at 684.

We remand to the trial court for a determination of prejudgment interest to be applied to the total damages recovered.

## DECISION

Affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.