AMERICAN ALLIANCE INSURANCE
COMPANY et al., Appellants,

v.

KELEKET X–RAY CORPORATION,
Appellee.

KELEKET X–RAY CORPORATION,
Cross-Appellant,

v.

AMERICAN ALLIANCE INSURANCE
COMPANY et al., Cross-Appellees.

Nos. 12981, 12982.

United States Court of Appeals
Sixth Circuit.

Oct. 19, 1957.

Miller, Circuit Judge, dissented.

William A. McKenzie, Cincinnati, Ohio, and Jacob T. Pincus, Chicago, Ill., Graydon, Head & Ritchey, Cincinnati, Ohio, Donald N. Clausen, Clausen, Hirsh & Miller, Chicago, Ill., on brief, for American Alliance Ins. Co. et al.

Joseph A. Segal (of Paxton & Seasongood), Cincinnati, Ohio, Robert P. Goldman, Thomas M. Stanton, Cincinnati, Ohio, for Keleket X-Ray Corp.

Before MARTIN, MILLER and STEWART, Circuit Judges.

MARTIN, Circuit Judge.

The Keleket X-Ray Corporation of Cincinnati, Ohio, plaintiff in the United States District Court and appellee-cross-appellant here, was engaged in the manufacture of instruments utilized in the measurement of radioactivity, such as Geiger Muller counters, ionization chambers, pocket dosimeters, and associated equipment.

On July 24, 1951, an incident occurred, occasioning loss to Keleket which has brought about this litigation. Several companies insuring Keleket against two types of loss were the parties defendant

in the district court and have appealed from its judgment.

The "stock policies," so termed, issued by defendants Citizens Insurance Company, Home Insurance Company, Insurance Company of North America, and the World Fire and Marine Insurance Company, insured Keleket against direct loss by explosion to stock, materials and supplies. Under the second type of policies (business interruption policies), Keleket was insured by American Alliance Insurance Company, American Eagle Fire Insurance Company, American & Foreign Insurance Company, California Insurance Company, Mercury Insurance Company, and World Fire & Marine Insurance Company, against loss of gross earnings resulting directly from necessary interruption of business caused by destruction or damage by explosion. After the filing of notices of appeal, the Insurance Company of North America and Keleket entered into a compromise agreement in satisfaction of the judgment against that defendant. Insurance Company of North America is therefore no longer a party to either the appeal or cross-appeal.

In the district court, Keleket alleged that a capsule containing a highly radioactive radium salt had exploded with the direct and proximate result that this material was disseminated throughout the plant. Large quantities of stock and material were contaminated and rendered unsalvageable. The manufacturing operation was necessarily interrupted, at least partially, for about five months because of the serious radiation hazard to personnel in the plant building and for the reason that the nature of the instruments produced required that no radioactive material be present.

It should be observed that, under the extended coverage endorsements of the policies, Keleket was insured against losses due to *explosion*. There was no insurance protection against radioactive contamination of itself. If the plaintiff were unable to establish the occurrence of an explosion, no liability would arise under any of the policies of insurance.

The accident alleged to be the explosion here was not a high order detonation accompanied by severe blast damage, but was of quite small proportions. Therefore, substantial issues were raised in the district court as to whether the accident was an "explosion" contemplated and covered by the several policies of insurance. Secondary issues arose as to whether the damages sustained by Keleket resulted directly from such explosion; and, if so, the extent of the liability of the insurers under the policies.

The case was tried in two stages. By stipulation, the only issue submitted to the jury was whether there had been an explosion of the radium source located in the plaintiff's plant. It was the verdict of the jury that there had been such an explosion. Pursuant to the stipulation and by further agreement of counsel, the remaining issues were submitted to a special master. He found that the damages were the direct result of such explosion and fixed the liabilities of the various insurers.

On July 2, 1956, the district judge entered judgment against the nine insurers in favor of Keleket, in consonance with the verdict of the jury and with the report and the supplemental report of the special master. In Case No. 12,981, the insurance companies have appealed generally from the judgment for $103,932.11 entered against them; in No. 12,982, Keleket, on cross-appeal, has raised the sole issue of whether the special master erred in determining the amount of plaintiff's loss of gross earnings under the "business interruption policies."

The salient facts in relation to Case No. 12,981, will be stated. An indispensible step in the manufacture of radiation measurement instruments is the calibration of those pieces of equipment. The appellee produces a device known as a "pocket dosimeter," which, in outward appearance, is not unlike a fountain pen. It consists of a plastic tube with a clip that may be worn in the pocket in the same manner as a pen is worn. The plastic tube contains a small electrometer for measuring the amount

of radiation to which it (and hence the wearer of the dosimeter) has been exposed. The calibration procedure determines whether or not the instruments accurately indicate the amount of exposure.

The method of calibration utilized by the appellee required a known source of radiation. A "radium needle" commonly used by the medical profession in radiation therapy was the source employed. The strength of its emission was known, having been measured by the Bureau of Standards. By placing the source for a given period of time at a known distance from the dosimeter to be tested, an accurate mathematical computation can be made of the radiation to which the instrument has been exposed. Comparison of the correct computation with the actual reading of the device would indicate the error, if any.

In order to expedite the calibration operation, the company used a specially constructed calibration stand. Its function was to store the known radium source within a protective lead vault, or "pig," when not in actual use (thus keeping personnel exposure to a minimum) and to facilitate the proper positioning of the source for calibration operations. The dosimeters to be calibrated were charged and placed in holders in the calibration stand. Compressed air from an ordinary tire pump was then employed to raise the radium source from the lead vault to the "calibrate" position, where it would be retained by a catch until released by an electrical timer after a predetermined period of time. Gravity would then return the source to its storage vault. The dosimeters thus exposed could be read to determine their accuracy.

The known source of radiation used in this calibration stand consisted of an iridium-platinum capsule, approximately 15 millimeters in length and 4 millimeters in diameter, which contained a highly radioactive radium salt (radium barium sulphate) in the form of a finely divided powder. Its actual radium content was approximately 49.1 milligrams.

This compound had been sealed within the capsule by a plug-type cap, brazed on with gold solder. The evidence is uncontradicted that this weld was poor, inasmuch as the solder had penetrated the joint only one, or two, thousandths of an inch.

On July 24, 1951, a Keleket physicist was using the stand for routine calibration operations. Upon depressing the plunger of the pump to elevate the capsule to the "calibrate" position, the physicist testified, he heard a "pop" and observed the emission of a white "mist" from the vent holes at the top of the stand. Subsequently, this "mist" was determined to be the finely powdered radium salt previously contained by the capsule. This radioactive powder released from the capsule, along with radon gas (a highly radioactive decay product of radium), permeated the plant and contaminated it throughout.

Appellants contend that the verdict of the jury that an explosion had occurred was not supported by substantial evidence. They urge further that the district court erred in overruling objections to the hypothetical question submitted to appellees' expert witnesses and that prejudicial error was committed by the trial judge also in charging the jury, for the stated reason that the definition of "explosion" employed in the charge was not that delineated by the Supreme Court of Ohio in United Life, Fire & Marine Insurance Co. v. Foote, 1872, 22 Ohio St. 340.

█ In our judgment, sufficient substantial evidence was adduced at the trial to support the verdict of the jury. The extended coverage clauses of the policies in question protected the insured plaintiffs against losses resulting from explosions of both large and small magnitude, the latter being nonetheless explosions despite their relatively small release of energy. The evidence viewed in a light most favorable to the appellee (plaintiff in the district court) demonstrates that the capsule was intact immediately prior to the accident. Highly qualified scientists calculate that the gas pressures

within the capsule (resulting from the gaseous decay products of the radium and the dissociation of water adsorbed by the radium barium sulphate) would range from 98 to 440 pounds per square inch. While these pressures appear to be small when translated into pounds of actual force acting upon the cap of the capsule, we think the jury was justified in inferring that the pressures were sufficient to, and did, cause an explosion. The popping noise and simultaneous appearance of a cloud of white powder or mist at the vent holes of the stand also substantiate the verdict. After the accident, it was determined that the cap of the capsule had been caught above the calibration stand's catch, while the capsule itself had returned to the vault, thus presenting strong circumstantial evidence that the two had been parted by some force from within the capsule.

■ We have carefully considered the appellants' objections to the hypothetical question posed by appellee to its expert witnesses and conclude that there is no basis for their contention that the question was improperly submitted because it excluded material evidence and included immaterial evidence. The premises upon which these experts were asked to state an opinion were sufficiently comprehensive in scope, not having excluded from consideration the facts in evidence which were essential to the formation of an intelligent opinion by each expert witness. See Squire v. Industrial Commission, Ohio App.1946, 70 N.E.2d 95, 46 O.L.A. 392. Appellants were not prejudiced by the inclusion of immaterial assumed facts in the question. There was substantial evidence to support those assumptions upon which the question was based. The question was analyzed by court and counsel; and appellee was required to make certain amendments. We think that District Judge Druffel's rulings on objections to the question were correct in every respect, indicating a comprehensive understanding of the highly technical testimony of the scientists. The responses of these experts —all top men in their field—were there-

fore competent evidence to be considered by the jury. Dr. J. W. Irvine, Jr., who participated extensively in the scientific investigation of the accident, said, in response to the question: "In my opinion the cause of the accident was the forceful expulsion of the cap from the capsule resulting from the gradual build-up and the sudden release of pressure in the radium capsule." Dr. Otto Glasser thus responded to the hypothetical question: "I think the cap of the capsule was blown out by the release of—suddenly blown out by the release of pressure inside the capsule and this gas, pressure of the gas that had accumulated over a long period of time * * *." Dr. Leon Curtis answered: "I believe the accident was caused by a gradual accumulation of pressure inside the capsule to the point where the cap was forcibly and violently expelled from the capsule by the accumulation of gas pressure within the capsule." On the strength of this expert testimony and the other evidence heretofore mentioned, we consider the verdict of the jury to have been supported by substantial evidence.

■ Appellants contend that the trial court erroneously instructed the jury with respect to the Ohio definition of "explosion." Appellee takes the position that this court may not consider this issue, as appellants did not take exception to the charge when delivered by the court. We recognize that the most important purpose of Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A. is to prevent litigants from challenging on appeal the correctness of the court's charge to the jury where no objections were raised before the trial judge, thus failing to afford him opportunity to correct inherent errors. We think, however, that in the instant case the objections raised by appellants in the discussion of the charge with the district judge properly preserved the right to assign alleged errors in the court's instructions.

There was incorporated in the charge the following definition of "explosion" found in Old Seeds Company v. Commercial Union Assurance Co. Ltd., 7 Cir.,

1950, 179 F.2d 472, 474: "It may be defined as a sudden accidental, violent bursting, breaking, or expansion caused by an internal force or pressure which may be and usually is accompanied by some noise." Appellants' principal objection to this definition is that it does not require noise as an essential element of an explosion. They urge that the express definition by the Supreme Court of Ohio in United Life, Fire & Marine Insurance Co. v. Foote, 1872, 22 Ohio St. 340, 348, should have been given in the charge: "An explosion may be described generally, as a sudden and rapid combustion, causing violent expansion of the air, and accompanied by a report. But the rapidity of the combustion, the violence of the expansion, and the vehemence of the report, vary in intensity as often as the occurrences multiply. Hence, an explosion is an idea of degrees, and the true meaning of the word, in each particular case, must be settled, not by any fixed standard, or accurate measurement, but by the common experience and notions of men in matters of that sort."

In our judgment, appellants' objection to the definition used by the court is not well taken. We think the Supreme Court of Ohio did not intend to establish —and indeed recognized that it would be impossible to establish—a hard and fast definition that would satisfy all factual situations. The opinion states: "The word 'explosion' is variously used in ordinary speech, and is not one that admits of exact definition. Its general characteristics may be described, but the exact facts which constitute what we call by that name, are not susceptible of such statement as will always distinguish the occurrences." United Life, Fire & Marine Insurance Co. v. Foote, 22 Ohio St. 340, 347. The so-called "Ohio definition" which followed the quoted words did not purport to be a universal definition, but rather a description relevant to the facts of the Foote case. Its inadequacies are apparent with respect to the instant situation, for here there was no "sudden and rapid combustion," no "violent ex-

pansion of the air" (on a large scale), and no "report" as that word is commonly used. These circumstances impel the belief that the district judge employed the most appropriate definition under the circumstances.

■■■ The district court adopted the "Report of Special Master" filed August 24, 1955, as modified by his supplemental report filed March 5, 1956. The court found that all losses due to the contamination of physical property and all business interruption losses were "the direct, immediate and proximate result of the explosion of the radium source" located at Keleket's plant. Appellants challenge this finding as being unsupported by substantial evidence. The findings of fact by the court are entitled to great weight and may not be set aside unless clearly erroneous. Rule 52, Federal Rules of Civil Procedure; Watterson v. New York Central R. R. Co., 6 Cir., 1956, 235 F.2d 114. There is testimony that the rapid expansion of the compressed gases occupying the interstices of this finely divided powder would have ejected a portion of the radium salt from the capsule at the time of the explosion. These salt particles were so small (a few microns in diameter) that they could be picked up easily by air currents and carried considerable distances. Highly radioactive radon gas also escaped from the capsule at the time of the explosion and was disseminated about the plant by natural air currents. Radon is unstable and, in a comparatively short period of time, will decay into a solid substance which is also highly radioactive. Fans in operation at the time of the explosion doubtless assisted the transportation of these air-borne contaminants throughout the plant. The findings of the special master, as confirmed by the district judge, on this issue are not clearly erroneous and are supported by substantial evidence.

■■■ We come now to more difficult questions presented by the cross-appeal (No. 12,982). The issue here is whether the special master properly determined the amount of the plaintiff's reduction in

gross earnings under the "business interruption policies," the "stock policies" not being involved in the cross-appeal. This issue may be further narrowed to a determination of whether or not the special master properly computed "the cost of all 'raw stock' from which such production is derived," a *sine qua non* for determining the losses under the business interruption policies, the material portions of which are as follows:

"The measure of recovery in the event of loss hereunder shall be the reduction in 'gross earnings' directly resulting from such interruption of business less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, but not exceeding the ACTUAL LOSS SUSTAINED by the insured resulting from such interruption of business. Due consideration shall be given to the continuation of normal charges and expenses, including payroll, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.

"Definition of 'Gross Earnings': For the purposes of this insurance 'gross earnings' are defined as the total net sales value of production through use of the property herein described, less the cost of all 'raw stock' from which such production is derived, plus other earnings derived from the operation of the business. In determining 'gross earnings' due consideration shall be given to the experience of the business before the loss and the probable experience thereafter had no such loss occurred."

In preparation for the hearings before the special master, both plaintiff and defendants employed certified public accountants to calculate the business interruption loss under the policies. The special master appointed by the district court, James R. Favret, was also a certified public accountant. Fred Dennis, witness for the insured, determined the loss in gross earnings during the period of interruption to be $102,006.70, while the special master, basing his computations on the figures of Iver Johnson, accountant for the insurers, found the loss to be $7,735.80. The master adopted Johnson's calculations, considering them to be more realistic. The insured now takes the position that, as a result of the master's decision, it has been deprived of the insurance protection purchased.

An examination of the basis of disagreement among these accountants is appropriate here. A reading of the quoted pertinent provisions of the several policies demonstrates that "the cost of 'raw stock' from which such production is derived" is indispensible datum for the calculation of the losses insured under the policies. All the accountants agreed that the only proper way to compute this cost was to determine the ratio of the cost of raw materials to the net sales value of production for a representative period of time. The years 1951 and 1952 were agreed to be representative of Keleket's operations, excepting the five-month interruption. The aforesaid ratio, expressed as a percentage, was then to be applied to the projected reduction in the net sales value of production resulting from interruption of business. The result is the cost of the raw stock from which the production would have been derived had the interruption not occurred. The wording of the policy obviously does not place any premium on an exact meaning of the word "cost." The "cost of 'raw stock'", of course, is not an exactly ascertainable amount, but must be approximated by projections and calculations based upon the "experience of the business before the loss and the probable experience

thereafter had no such loss occurred" as specified by the policies in respect to determining gross earnings. This is the procedure which the accountants have followed in arriving at their material costs.

Although the accountants arrived at different material cost percentages, they used the same method for calculating them. In determining the cost of raw materials used during the representative years 1951 and 1952 they added the purchases for those two years to the opening inventory as of December 31, 1950. From this total they deducted the closing inventory taken as of December 31, 1952. The accountants disagreed as to the figure which should have been used as the closing inventory, thus the resultant difference between their material cost percentages. See calculations in the margin.[1]

Cross-appellant insists that the policies require the closing inventory used in computing the material cost percentage to be stated at cost. The master, following the recommendations of accountant Johnson, adopted the value of

closing inventory as shown on Kelcket's books. The latter figure reflects a so-called "write-down" of material inventories "to provide principally for extraordinary obsolescence." Cross-appellant insists that the "write-down" is an "entirely irrelevant circumstance" which should not be considered in computing the losses according to the terms of the business interruption policies.

The reasons stated by the special master for accepting the written down inventory are stated in the Report of Special Master, as follows: In "computing material costs, write down of inventory must be taken into consideration, particularly where the inventory at the beginning of the year was shown to have been verified by competent independent accountants as being composed of normal usable inventory stock at that time." The special master elaborated in his supplemental report: "The parties are all in agreement that early in 1951 an inventory of and limited to usable inventory stock was taken and verified by competent independent accountants. The plaintiff, in Exhibit 32, at page 15, es-

**1.**

|  | Plaintiff's Accountant Dennis | Defendants' Accountant Johnson |
|---|---|---|
| Material inventory, 12/31/50, at cost (stipulated) | $ 268,742.11 | $ 268,742.11 |
| Purchases 1951 (stipulated) | 695,240.43 | 695,240.43 |
| Purchases 1952 (stipulated) | 215,375.06 | 215,375.06 |
|  | $1,179,357.60 | $1,179,357.60 |
| Material inventory 12/31/52 | 229,327.04 | 91,639.02 |
|  | 950,030.56 | 1,087,718.58 |
| Deduct materials contaminated | 36,743.91 | 36,743.91 |
| Materials used in production 1951 and 1952 | 913,286.65 | 1,050,974.67 |
| Sales, calendar years 1951–1952 | $1,529,092.39 | $1,529,092.39 |
| Materials used in 1951–52, expressed as a percentage of sales | 59.727% | 68.732% |
| Projected net sales value of production lost during interruption (not in issue) | $ 424,342.62 | $ 424,342.62 |
| Material cost percentage | $\times$ .59727 | $\times$ .68732 |
| Cost of raw stock that would have been used during period of interruption | $ 253,447.12 | $ 291,659.16* |
|  |  | (adopted by master) |

* The adoption by the special master of the higher raw stock cost figure calculated by Accountant Johnson results in a difference in gross earnings of about $38,000.00.

tablished that 'the company did not maintain a cost system showing material costs of production.' The Master therefore concluded and still concludes, not that any arbitrary accounting conception should be adopted, but simply that as a matter of fact the plaintiff's own general accounting records and supporting data, coupled with physical inventory, provide the best record of material cost." This finding was made on the assumption that the insured plaintiff had the burden of proof. In the event that he was in error in placing the burden of proof, the master made an alternate finding stating that "it is the Master's finding of fact, based on the evidence, that the items represented by the write-down were 'raw stock from which such production is derived.' "

Cross-appellant urges: "There is involved only a question of law as to the correct interpretation of the policies, and this cross-appeal is limited to that question." Under familiar rules of construction, when its meaning is doubtful, an insurance policy must be construed strictly against the insurer and liberally in favor of the insured. American Policyholders' Ins. Co. v. Michota, 1952, 156 Ohio St. 578, 103 N.E.2d 817, 35 A.L.R.2d 448. In our judgment, however, these policies do not have such attributes of ambiguity as would necessitate the application of the aforestated rule of construction.

The loss must be determined strictly in accordance with the terms of the insurance policies and not solely in conformity with the accounting practices followed by the insured. Puget Sound Lumber Co. v. Mechanics' & Traders' Ins. Co., 1932, 168 Wash. 46, 10 P.2d 568; Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp., 4 Cir., 1933, 64 F.2d 347, certiorari denied 289 U.S. 762, 53 S.Ct. 795, 77 L.Ed. 1505. These authorities do not hold the accounts of an insured to be irrelevant under all circumstances for purposes of computing losses under insurance contracts. The cases do stand for the proposition that the finder of fact is not finally bound by the ac-counting records of the insured when making a determination of loss under a policy. "It is undoubtedly true that, in an action upon such a policy, the trier of facts is entitled to consider the methods of accounting maintained by the insured prior to the loss, but we cannot agree with appellants that any particular system of accounting is controlling in determining questions of liability under the policies." Puget Sound Lumber Co. v. Mechanics' & Traders' Ins. Co., 168 Wash. 46, at page 51, 10 P.2d at page 571, supra.

The "practical way" test evolved in the Fidelity-Phenix case, supra [64 F.2d 352] also clearly indicates this principle: "We think it clear that such losses are to be determined in a practical way, having regard to the experience of the business before the fire and its probable experience thereafter, without being confined to the basis upon which books are kept for income tax purposes or for dealings with stockholders. Hutchings v. Caledonian Ins. Co., D.C., 52 F.2d 744." [The Puget Sound case, supra, is also cited.] The purpose of a business interruption policy is to "do for the insured in event of a business interruption * *, just what the business itself would have done if no interruption had occurred." National Union Fire Ins. Co. v. Anderson Pritchard Oil Corp., 10 Cir., 1944, 141 F.2d 443, 445. See Miller v. Hocking Glass Co., 6 Cir., 1935, 80 F.2d 436.

Inasmuch as the chief end of any accounting system is the proper allocation of costs and expenses to revenues for a given period of time, so that the financial success of the operation may be determined, information derived from the accounts may materially assist in determining the losses in a "practical way" and in giving effect to the "purpose" of the business interruption policy. The accounts may not be followed blindly, but should be accorded such weight as practical judgment dictates, all relevant matters having been duly considered. The district judge recognized that practical accounting problems were involved when he appointed a certified public accountant

as special master to resolve the question of the amount of liability under the several insurance contracts.

The reports of the master do not indicate that he has based his conclusions solely on the accounting records of the insured, or on any other arbitrary accounting predilections. He considered not only Keleket's accounts, but also supporting data and physical inventory. Based upon the evidence adduced, he found that the inventory data contained in the accounts of the insured were the best evidence of the cost of raw materials from which production was derived in 1951 and 1952.

The burden of proof was on the plaintiff and it is, therefore, unnecessary to consider whether substantial evidence supported the master's alternative finding (that the items represented by the inventory write-down actually were "raw stock from which such production is derived"). Suffice it to say, there was evidence from which to deduce practical reasons for including as part of the raw material cost those items representing write-down of inventory, even though such items actually remain in stock at the time the inventory is taken. There was testimony that this procedure is typical where a manufacturer produces "made to order" goods under individual contract. Most of Keleket's instruments were produced for the United States Government on a per contract basis. There are practical reasons why excess materials are commonly found in inventory upon completion of such contracts. In estimating requirements, there is a justifiable tendency to overbuy, in order to allow for spoiled materials, shop errors and the like. This is especially true where "tooled" goods are purchased, for the cost of a few extras at the outset will be insignificant when compared with the cost of procuring a few items at a later date to compensate for an under-purchase. Similar reasoning would apply to volume discount purchases. The extra costs of material resulting from these and similar overpurchases are logically charged as a cost of raw materials from which production was derived, even though all items purchased are not physically incorporated in the finished product after completion of the contract. Excess raw materials remaining in inventory after termination of a contract, and having no utility in future production, should logically be charged as a cost of materials attributable to the contract for which they were purchased. Over-purchases are recurring items of material cost arising as often as contracts reach their final disposition. They are not items which would distort gross earnings if applied as a cost of raw materials. Apparently this was the reasoning of the master when, in effect, he found the evidence to show that the depreciation or obsolescence which led to the write-down occurred within the representative two-year period and should therefore be taken into account.

Late in 1952, Keleket decided to discontinue production of its electronic detection devices which were in competition with products of Tracerlab, a corporation holding controlling stock in Keleket. It is contended that the write-down was exceedingly large and was of an unusual nature, having been necessitated by curtailment of production, and that therefore the adjustment of accounts should be made in such manner as not to affect the gross earnings. There would seem to be no difference between the completion of a typical government contract and the discontinuance of a particular line of instruments. Materials left over from either are recurring material costs properly allocable to the contract for which purchased. The proportionally small write-down [approximately $137,000] represented about 11% of the usable inventory on hand as of January 1, 1951, plus raw materials purchased to fill contracts in 1951 and 1952.

Consistency would seem to compel the decision we have reached on this issue. The formula employed by the accountants to determine material costs for the representative years 1951 and 1952 required opening and closing inventory figures. The opening inventory here (taken De-

cember 31, 1950) "was composed of normal usable inventory stock." Certain unusable items were excluded therefrom. The witness, Walsh, testified that these items had been omitted from that inventory, inasmuch as the company considered them to have no substantial value "in view of the fact that there had been no purchases of those items during the preceding six-month period * * * ." It follows that the closing inventory (taken December 31, 1952) must also consist of normal usable inventory stock and not a mixture of usable and unusable items. The special master properly adopted the closing inventory from which unusable items had been separated. Therefore, both the opening and the closing inventories consisted of usable inventory items at cost. The result was a reliable calculation of the cost of materials used in the representative two-year period.

The master exercised sound and practical judgment in determining the amount of loss under the several contracts of business interruption insurance. His calculations are in accord with the provisions of the policies, they are based upon findings which are supported by substantial evidence, and are not clearly erroneous. The cross-appeal is, therefore, dismissed.

The final issue in the appeal [No. 12,981] relates to certain decontamination expenses allowed by the master and the district court under the following clause of the business interruption policies: "Expense to Reduce Loss: This policy insures such expenses as are necessarily incurred for the purpose of reducing any loss *under this policy* (except expense incurred to extinguish a fire) not exceeding, however, the amount by which the loss *under this policy* is thereby reduced, and such expenses shall not be subject to the application of the Contribution Clause." [Emphasis added.] Here, again, we think that the words of the policy are not sufficiently ambiguous to necessitate the application of rules of construction.

The above-quoted clause refers twice to "loss under this policy." The terms of these business interruption policies have been discussed in detail in our consideration of the cross-appeal. It is apparent that the matter involved is not compensation for destruction of physical property, but for the loss of gross earnings due to the interruption of business resulting from an explosion, a hazard insured against under these policies. Certainly the plant building itself is not the interest insured under these contracts of business interruption insurance. The insured was required by the "due diligence" clause of its policies to "exercise due diligence and dispatch to rebuild, repair or replace" this building and the payment for reduction of gross earnings was to continue for "only such length of time as would be required to effect" these repairs.

Keleket argues that decontamination of the building did not require any rebuilding, repairing or replacing and that, therefore, nothing was required of it in this respect. The evidence is to the contrary. The methods employed to remove the radium from this building were similar to typical restoration activity following a fire. Several procedures were necessary in the decontamination process. Where possible, the building was repeatedly washed with a complexing agent, versene solution, to remove the contaminant. Washing proved ineffective where the radium salt had been taken up by porous material such as wood or concrete. The only effective procedure under these circumstances was to remove the contaminated porous materials. The concrete floors and woodwork had to be replaced in some portions of the building.

The insurers do not contend that Keleket failed to use due diligence and dispatch in decontaminating the plant building, nor has the insured introduced any evidence of expenses necessarily incurred to reduce the business interruption losses. Had the plaintiff shown that the period of interruption had been shortened by use of overtime labor at premium wages, for example, then the premium wages would be allowable up to the amount by which the liabilities of the in-

surers under the business interruption policies had been reduced. The record is devoid of evidence to this effect. In the absence of evidence showing that the expenditures had actually reduced the business interruption losses, the district court was in error in allowing any decontamination expense as an expense incurred to reduce the loss under the business interruption policies.

As heretofore stated, the cross-appeal in No. 12,982 is dismissed. Case No. 12,981 is remanded to the district court with instruction to recompute the liabilities of appellants, under the business interruption policies only, disallowing decontamination expenses. In making the recomputation, the liabilities of the several insurers should be reduced ratably according to the face amounts of the policies so as to disallow $19,862.69 [plus accrued interest thereon], the net decontamination expense allowed by the special master. The master's finding of fact that the employees to whom $28,739.13 had been paid "would have been retained in any or all event by the plaintiff" proscribes further consideration of that item with respect to computation of liability, inasmuch as that expense necessarily continued during the period of interruption. The total liability of the several insurers under the business interruption policies is $7,735.80, plus interest. Liability under the "stock policies" remains unmodified. The withdrawal of the Insurance Company of North America as a party to the appeal, pursuant to settlement, should in no way affect the liabilities of the remaining appellants.

Except as modified, the judgment of the district court is affirmed.

SHACKELFORD MILLER, Jr., Circuit Judge (dissenting).

The Special Master found that the appellee had suffered a stock loss in the amount of $55,724.56. He also found that the appellee had suffered loss due to business interruption in the amount of $7,735.80. He also allowed the sum of $19,862.69 as having been necessarily incurred to reduce the loss, referred to as decontamination expense. The District Judge overruled objections to these findings and entered judgment for these amounts, together with 6% interest from May 20, 1952, totaling $103,932.11, dividing the liability between the different appellants in accordance with the amounts of their respective policies.

The majority opinion approves the finding of loss in the amount of $7,735.80 due to business interruption. Appellee contends that this item of damage should have been approximately $38,212.00 more.

Under the policy the measure of recovery for this item was "the reduction in 'gross earnings' directly resulting from such interruption of business less charges and expenses which do not necessarily continue during the interruption of business, * * * ." Gross earnings was defined as "the total net sales value of production through use of the property herein described, less the cost of all 'raw stock' from which such production is derived, plus other earnings derived from the operation of the business." The method used by the accountants for the parties for determining the cost of raw materials was to determine the ratio of cost of raw materials to net sales for a representative period and then to apply this ratio, expressed as a percentage, to the net sales value of production lost during the period of interruption. This was done by starting with the value of material inventory at cost as of December 31, 1950, adding to it purchases made in 1951 and 1952, and subtracting from the total the value of material inventory as of December 31, 1952, and the value of materials contaminated. The resulting figure was the value of materials used in production during 1951 and 1952. The percentage which this bore to sales during 1951 and 1952 was the ratio used, which, when applied to the total net sales, which were lost during the period the plant was out of production, determined the cost of the raw stock which would have been used in such production. The cost of the raw stock was then subtracted

from the lost sales in order to determine the loss of gross earnings insured against. The use of this formula meant that as the value of material inventory as of December 31, 1952, became lower there was a corresponding increase in the value of materials used in production during 1951 and 1952 with a resulting higher percentage of materials to sales, which, when applied to and deducted from the lost sales, reduced the amount of lost gross earnings. The company's accountant computed this percentage at 59.727%. The insurer's accountant computed this percentage at 68.732%. The use of the higher percentage resulted in an increase of approximately $38,212.00 in the cost of raw material for the period insured against with a corresponding less amount in the amount of gross earnings for that period. The judgment limiting the loss to $7,735.80 on this item was the result of the use of the higher percentage, which the company contends was error. I think the contention is well taken.

The difference in the two percentages resulted from the different valuations placed by the respective accountants on the material inventory as of December 31, 1952. The company valued this inventory at its cost of $229,327.04. The insurer valued it at $91,639.02, the difference of $137,688.02 being the amount by which the value of the inventory had been written down on the company's books at the end of 1952. There was testimony that the write down had been made in order to provide for extraordinary obsolescence in certain materials resulting from (1) a discontinuance by the company of the production of certain electronic instruments and (2) the cancellation of a Government contract, leaving on hand a quantity of unused material previously purchased in the expectation of continuing with such production.

I am of the opinion that the value of the material inventory as of December 31, 1952, should have been computed at its cost, instead of at its cost less depreciation as shown by the company's books. The depreciated value on the books may have been the correct value for the purpose of determining the net asset value of the company as of December 31, 1952, or for reflecting on an accrual basis the net income of the company for 1952 income tax purposes, but such a valuation does not seem to be correct for determining the "cost" of the raw stock which would have gone into production. Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp., 4 Cir., 64 F.2d 347, 352, certiorari denied, 289 U.S. 762, 53 S.Ct. 795, 77 L.Ed. 1505; Puget Sound Lumber Co. v. Mechanics' & Traders' Ins. Co., 168 Wash. 46, 51–52, 10 P.2d 568. The materials whose value was written down were not used in production. If they had been used in production they would not have been on hand on December 31, 1952, to have been included in the closing inventory. The depreciated value was merely a bookkeeping entry reflecting the company's opinion as to their value at the end of 1952 by reason of extraordinary obsolescence.

The policy provides for deducting the "cost" of the raw stock from which production is derived. I construe this to mean the *actual* "cost," which would be the actual cost of the materials on hand at the start of the period plus the cost of purchases during the period less the actual cost (not depreciated value) of the materials on hand at the end of the period. There is to me an unacceptable inconsistency in using actual *cost* figures for the opening inventory and for purchases during the period and using a depreciated bookkeeping *value* at the end of the period. Cost and value are of course not synonymous.

The majority opinion also eliminates from the judgment the decontamination expense of $19,862.69. I am of the view that this item should be retained in the judgment. I recognize that none of the policies involved covered the building against damage due to explosion and that it would be the obligation of the insured to repair any such damage to the building in order that business might be re-

sumed. But I do not construe the decontamination expense incurred in the removal of the radium from the building as repairing damage to the building. It is clear that production could not be resumed after the explosion until the building had been decontaminated by removal of the radium. In my opinion, such an expense was included in the policy provision covering "such expenses as are necessarily incurred for the purpose of reducing any loss under the policy (except expense incurred to extinguish a fire), * * *." This provision is very broad, including only one exception. Other exceptions should not be read into the policy. Home Indemnity Co. v. Village of Plymouth, 146 Ohio St. 96, 101, 64 N.E.2d 248.

I am of the opinion that the judgment should be reversed for the foregoing reasons.