**ASSOCIATED PHOTOGRAPHERS, INC., Appellant,**

v.

**AETNA CASUALTY & SURETY COMPANY, an Insurance Corporation, Appellee.**

No. 81–1797.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 9, 1982.

Decided May 12, 1982.

Paul H. Niewald, Stephen S. Brown, Niewald, Risjord & Waldeck, Kansas City, Mo., for appellant.

Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, P. C., R. Frederick Walters, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, STEPHEN-SON,* Circuit Judge, and OVERTON,** District Judge.

STEPHENSON, Circuit Judge.

Plaintiff-appellant Associated Photographers, Inc. (Associated) appeals from a jury verdict awarding it $160,808.99 for business interruption loss and $204,001.03 for property damage on its insurance contract with Aetna Casualty & Surety Company (Aetna). The district court[1] entered a directed verdict for Aetna on Associated's claim for damages for the independent tort of bad faith refusal to pay and on Associated's claim for statutory penalties for vexatious refusal to pay. Associated argues that the court incorrectly instructed the jury on the method of calculating the business interruption loss and incorrectly excluded evidence of different types of business interruption policies. Additionally, Associated claims that the court erred in directing a verdict on its claim for the independent tort of bad faith.[2] We affirm the district court.

## I. BACKGROUND

Associated is a corporation engaged in the business of producing photographic prints from film submitted to it by professional photographers. The primary source of its business is the processing of class and individual school pictures for students from elementary schools through colleges. The heaviest season of the school picture processing business is in the fall from Labor Day until Christmas. The spring season is from February through April and its volume of business is greater than the summer and winter seasons but less than the fall season. Timely delivery by Associated is an important part of the processing business because the photographers have deadlines imposed upon them by the schools.

On September 29, 1977, at approximately 4:30 p. m. an employee accidentally started a fire in the spray booth used to apply lacquer to the photographs. Although the fire was confined to the lacquer booth, smoke from the fire spread throughout the building. After the fire was extinguished, the employees re-entered the building and noticed that a residue from the smoke covered most of the surfaces in the plant, including the electronic printers. The employees immediately began cleaning up the building and the electronic printers. The 35 mm electronic printers were back in operation the next day and the 70 mm electronic printers were operating within a week. By October 21, 1977, the lacquer spray booth was back in full operation.

Although the printers were operating, they were operating erratically which caused unacceptable prints or rejects. The parties disagree as to the length of time Associated's business was interrupted due to fire-related printer problems. Aetna contends that by December 1, 1977, the company was operating normally. Associated argues that its problems continued until the spring and early summer of 1978. Thus, the parties differ approximately seven months as to the length of the suspension period. The parties were unable to agree upon the amount due Associated on

* The Honorable Roy L. Stephenson assumed senior status effective April 1, 1982.

** The Honorable William R. Overton, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The Honorable Russell G. Clark, Chief Judge, United States District Court for the Western District of Missouri.

2. Associated does not appeal from the award of $204,001.03 for property damage suffered as a result of the fire.

its contract of insurance with Aetna. On October 19, 1978, Associated filed a complaint against Aetna. In Count I, Associated claimed damages for business interruption and vexatious refusal to pay the business interruption damages. In Count II, Associated sought damages for physical damage to property as a result of the fire as well as for vexatious refusal to pay. Count III included Associated's damages claim based on the independent tort of bad faith refusal to pay.

The jury trial of the case began on April 27, 1981. The verdict for Associated was returned on May 11, 1981. The jury awarded Associated $160,808.99 on Count I and $204,001.03 on Count II. The district court directed a verdict for Aetna on the vexatious refusal to pay claims of Count I and Count II and on the Count III tort claim.

## II. ANALYSIS

Associated had purchased and was covered by business interruption insurance from Aetna. The purpose of business interruption insurance is "to protect the prospective earnings of the insured business only to the extent that they would have been earned if no interruption had occurred * * *." *National Union Fire Ins. Co. v. Anderson-Prichard Oil Corp.*, 141 F.2d 443, 445 (10th Cir. 1944). The basic objective of a business is to realize earnings and business interruption insurance recognizes and protects an insurable interest in a business' earnings. *Northwestern States Portland Cement Co. v. Hartford Fire Insurance Co.*, 360 F.2d 531, 534 (8th Cir. 1966).

### A. *Instruction 10: Calculating the Business Interruption Loss*

Associated argues that the instruction indicating the method of calculating the business interruption loss, instruction 10, is not in accord with the language of its insurance policy. A related argument advanced by Associated is that the court erred by not giving Associated's two proffered instructions which accurately set forth the compensation it was entitled to receive according to the insurance policy's language.

The pertinent portion of the insurance policy provides:

2. The Company shall be liable for:

a. the actual loss sustained by the insured resulting directly from necessary interruption of business, but not exceeding the reduction in gross earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed commencing with the date of such damage or destruction and not limited by the date of expiration of this policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the insured with the same quality of service which existed immediately preceding the loss * * *.

5. Definitions:

a. For the purposes of this insurance, "gross earnings" are defined as the sum of:

(1) total net sales value of production, and

(2) total net sales of merchandise, and

(3) other earnings derived from operations of the business,

less the cost of:

(4) raw stock from which such production is derived, and

(5) supplies consisting of materials consumed directly in the conversion of such raw stock into finished stock or in supplying the services sold by the insured, and

(6) merchandise sold, including packaging materials therefor, and

(7) services purchased from outsiders (not employees of the insured) for resale which do not continue under contract.

No other costs shall be deducted in determining gross earnings.

In determining gross earnings, due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

■ The trial court correctly refused to give Associated's proposed instructions B[3] and C[4] because they erroneously state the measure of damages under the contract of insurance. Associated argued and both proposed instructions state that Associated's recovery is limited only by its loss of gross earnings. These instructions ignore the language of the insurance policy clearly limiting Associated's recovery to the "reduction in gross earnings *less charges and expenses which do not necessarily continue* during the interruption of the business * * *." Since both proposed instructions omit the required deduction of noncontinuing expenses, Associated's instructions do not conform to the policy language.[5]

Associated's argument that the court erred in using the net profit formula of instruction 10 is also without merit. Instruction 10 provides:

You are instructed that under the insurance policy defendant agreed to protect the earnings which the plaintiff would have enjoyed had there been no interruption of business as a direct result of the fire and to reimburse plaintiff for expenses incurred by it in reducing its loss of earnings.

On Count I, if you find plaintiff suffered a loss due to interruption of business as a direct result of the fire, you should award plaintiff for the actual loss of earnings you believe it sustained as a direct result of the fire (business interruption) plus any expenses plaintiff incurred, if any, in reducing its loss of earnings unless you believe plaintiff is not entitled to recover by reason of Instruction No. 12.[6]

You are instructed that actual loss of earnings means the difference between the net profit you find plaintiff would have earned during the period of interruption and the net profit you find plaintiff did earn during the period of interruption.

■ The following calculations, using figures from one of Aetna's exhibits (based

---

**3.** Associated's proposed Instruction B provided:

You are instructed that the defendant issued its Policy of Insurance to plaintiff covering actual loss sustained, *not exceeding gross earnings*, resulting directly from necessary interruption of business caused directly from physical damage to personal property, and that the Policy of Insurance was in force and effect on the date of the occurrence of September 29, 1977.

You are, therefore, instructed that if you find that plaintiff sustained an actual loss, *not exceeding loss of gross earnings*, due to interruption of its business as the result of the direct physical loss occurring on September 29, 1977, your verdict must be in favor of plaintiff on Count I of its Petition (emphasis added).

**4.** Associated's proposed Instruction C provided:

The Court instructs the jury that if you find the issues in favor of the plaintiff on Count I for Business Interruption, then you must award plaintiff such sum as you believe will compensate plaintiff for its actual loss sustained *not exceeding its loss of gross earnings* (emphasis added).

**5.** Gross earnings would be the measure of recovery only where the business expenses remain constant during the period of interruption. In other words, when there are not any noncontinuing expenses to be deducted from gross earnings. However, here the amount of noncontinuing expenses is a question of fact for the jury and an instruction completely ignoring such deduction is incorrect.

Generally, during a period of business interruption some of the normal expenses of the business are not incurred. If the insured was awarded the reduction in gross earnings without subtracting expenses which it saved or did not incur during the interruption, the insured would be in a better financial position than it would have been had there been no interruption. Where noncontinuing expenses exist, the reduction in gross earnings alone cannot be the amount recoverable because "the policy is designed to do for the insured * * * just what the business itself would have done if no interruption had occurred—*no more*." *National Union Fire Ins. Co. v. Anderson-Prichard Oil Corp.*, 141 F.2d 443, 445 (10th Cir. 1944) (emphasis added).

**6.** Instruction 12 involves the affirmative defense of fraud and false swearing.

on a two month suspension period), demonstrate that the instruction formula of difference between the projected net profit and the actual net profit is here equivalent to the policy language of reduction of gross earnings minus noncontinuing expenses.

|  | No Fire (projected) | Fire (actual) | Difference |
|---|---|---|---|
| Gross Earnings | 606,456 | 501,757 | 104,699 (reduction in gross earnings) |
| Expenses | 383,663 | 305,941 | 77,722 (noncontinuing expenses) |
| Net Profit | 222,793 | 195,816 | 26,977 (business interruption loss) |

The policy limits the liability of Aetna to the reduction in gross earnings minus any noncontinuing expenses. Paragraph 5(a) of the policy sets out the procedure to be used in determining gross earnings. "Reduction" in gross earnings means the difference between the projected gross earnings Associated would have earned but for the fire (calculated as prescribed in paragraph 5(a)—$606,456) and the gross earnings Associated actually earned after the fire ($501,757). The policy requires that this "reduction in gross earnings" amount ($104,699) be reduced by "charges and ex-

penses which do not necessarily continue during the interruption of business." This language refers to any expenses of Associated which, because of the fire and subsequent business interruption, are not incurred by Associated during the interruption.[7] Therefore, the policy requires that any discontinued expenses ($77,722) be subtracted from the reduction in gross earnings ($104,699) and the resulting figure is the maximum amount recoverable under the policy ($26,977).

The same result is reached through the instruction's formula of the difference between the projected net and the actual net profit. Net profit is gross earnings minus Associated's expenses. The projected net profit if no fire had occurred is $222,793 ($606,456—$383,663). The net profit actually earned after the fire is $195,816 ($501,757—$305,941). The difference in net profit ($222,793—$195,816) is $26,977. Therefore, the trial court's instruction is proper here since the difference in net profits using the figures in the exhibit of Aetna is equivalent to the reduction in gross earnings minus noncontinuing expenses.[8] The court's instruction merely simplified the calculations the jury would be required to perform as it determined the amount of business inter-

7. Expenses can be generally categorized as continuing or noncontinuing. Continuing expenses are expenses that do not change during a business interruption, for example, rent or interest on debt. Noncontinuing expenses are expenses which are saved or discontinued because of the business interruption. Examples of noncontinuing expenses include salaries of hourly workers and employment taxes.

8. Associated argued that all its expenses continued and that it was therefore entitled to receive the amount equal to its reduction in gross earnings as its business interruption loss. The following calculations, using figures from one of Associated's exhibits (based on a nine month suspension period), show that the jury instruction's net profit formula yields the result Associated contends it was entitled to receive.

|  | No Fire (projected) | Fire (actual) | Difference |
|---|---|---|---|
| Gross Earnings | 1,888,806 | 966,724 | 922,082 (reduction in gross earnings) |
| Expenses | 869,968 | 869,968 | 0 (noncontinuing expenses) |
| Net Profit | 1,018,838 | 96,756 | 922,082 (loss) |

Associated projected gross earnings of $1,888,806 and listed actual gross earnings of $966,724. Subtracting those two yields a reduction in gross earnings of $922,082, which is the amount Associated argued to the jury that it was due under the insurance contract. Associated did not put in evidence its actual operating expenses during the business interruption; however, the figure is argued to be the same both in the no fire projection category and the after-fire expenses category so that the difference between the two yields zero noncontinuing expenses. By determining from Associated's evidence the percent of gross earnings that expenses generally comprised and then taking that percent times Associated's total estimated gross earnings, the expenses are approximately

ruption loss sustained by Associated. The language of the instruction is equivalent to the language in the policy.

**B.** *Instruction 10: Associated's 1974 Loss*

■ Associated next argues that instruction 10 is incorrect and that its calculations were correct because a previous business interruption loss in 1974 was adjusted and paid by Aetna in accordance with Associated's present view that it is entitled to the reduction in gross earnings. Associated relies on language from the case of *Leggett v. Missouri State Life Insurance Co.,* 342 S.W.2d 833 (Mo.1961). The Missouri Supreme Court therein stated: "Where the parties themselves have placed a knowledgeable, uniform, consistent and longtime construction upon the provisions of an *ambiguous* contract, such a construction is persuasive and ordinarily will be accepted by the courts, unless it is contrary to the obvious intendment of the contract." *Id.* at 852 (emphasis added).

Associated's argument that the policy language setting forth the amount of recov-

ery is ambiguous ignores Eighth Circuit precedent. In *Rogers v. American Insurance Co.,* 338 F.2d 240, 242 (8th Cir. 1964), we held that a policy with language identical to the language disputed here was free of ambiguity.[9] Three other courts have also ruled that a same or similar business interruption insurance policy is free of ambiguity. *See Eastern Associated Coal Corp. v. Aetna Casualty & Surety Co.,* 632 F.2d 1068, 1077 (3d Cir. 1980), *cert. denied,* 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 843 (1981) ("We agree with the insurers and find this language unambiguous.");[10] *American Alliance Insurance Co. v. Keleket X-Ray Corp.,* 248 F.2d 920, 928 (6th Cir. 1957);[11] *Steel Products Co. v. Millers National Insurance Co.,* 209 N.W.2d 32, 37 (Iowa 1973) ("no ambiguity is suggested by the policy terms, although proof * * * may introduce evidentiary complexity").[12] The language in the policy between Aetna and Associated is unambiguous;[13] therefore, the evidence regarding calculations used in the 1974 loss was properly excluded and irrelevant to the present dispute. There is no need to resort to the rules of construc-

$869,968. When that amount is subtracted from the projected gross earnings, the resulting net profit is $1,018,838. Doing the same subtraction from the actual gross earnings yields a net profit of $96,756. Following the jury instruction formula, the difference between the two net profits is $922,082, the amount Associated argued it was entitled to receive.

**9.** The court quoted the following policy language: "Company shall be liable for the ACTUAL LOSS SUSTAINED * * * but not exceeding the reduction in Gross Earnings less charges and expenses which do not necessarily continue * * *." *Rogers v. American Ins. Co.,* 338 F.2d 240, 242 (8th Cir. 1964).

**10.** The policy contained the following language: "Recovery * * * shall be the ACTUAL LOSS SUSTAINED * * * but not exceeding the reduction in earnings less charges and expenses which do not necessarily continue * * *." *Eastern Associated Coal Corp. v. Aetna Cas. & Sur. Co., supra,* 632 F.2d at 1076.

**11.** The policy language was as follows: "The measure of recovery * * * shall be the reduction in 'gross earnings' * * * less charges and expenses which do not necessarily continue * * *." *American Alliance Ins. Co. v. Keleket X-Ray Corp.,* 248 F.2d 920, 926 (6th Cir. 1957).

**12.** The policy contained the following language: "Company shall be liable for the ACTUAL LOSS SUSTAINED * * * but not exceeding the reduction in Gross Earnings less charges and expenses which do not necessarily continue * * *." *Steel Products Co. v. Millers Nat'l Ins. Co.,* 209 N.W.2d 32, 34 (Iowa 1973).

**13.** Our conclusion that the insurance policy is unambiguous disposes of Associated's argument that its following proposed jury instruction should have been given to the jury. "The terms of the insurance policy (including any endorsements attached thereto) are susceptible of more than one meaning. Therefore, you must give the policy provisions that meaning which is most favorable to the policyholder." The instruction was properly denied since the policy, as a matter of law, is unambiguous.

Likewise, Associated's argument that the court erred in excluding its exhibit 67 and in limiting its cross-examination of Aetna's accountant concerning calculations to be made under other types of business interruption policies is without merit. Exhibit 67 was a 1961 business interruption form and was not a part of the insurance policy between Aetna and Associated. Since the policy between Aetna and Associated is not ambiguous, this evidence was properly excluded.

tion and the *Leggett* case relied upon by Associated is inapplicable.

### C. *Instruction 10: Fraud Defense*

■ Associated's last challenge to instruction 10 is that the instruction improperly included the affirmative defense of fraud. Associated argues that there was no substantial evidence to support submission of the defense and challenges the following language: "unless you believe plaintiff is not entitled to recover by reason of Instruction No. 12." [14] Associated argues it was prejudiced by the language even though the jury did award it damages under Count I because the instruction cast it in the light of a wrongdoer whose recovery should be at least diminished.

The court correctly submitted the affirmative defense of fraud to the jury. The following evidence more than adequately supported the submission of the instruction. John V. Hanline, President of Associated, submitted an invoice to Ron Bledsoe, Aetna's claim representative. The invoice was from HyPag Engineering Company and Bledsoe testified that he understood that HyPag had been repairing the damaged circuit boards which repair to date cost $57,300. At the time Hanline submitted the invoice to Aetna, Aetna was attempting to determine what amount of money to advance Associated on its insurance claim.

HyPag had not repaired any of the circuit boards. John V. Hanline and his son John R. Hanline did all of the repairs on the boards. John R. Hanline testified under oath in an August 22, 1979 deposition that he and his father had done the work on the boards. Subsequently, John V. Hanline admitted at trial that he had, in substance, lied under oath when he had testified in a December 1978 deposition that HyPag had repaired the boards and had submitted the bill for such repairs.

### D. *Independent Tort of Bad Faith*

The district court granted Aetna's motion for a directed verdict on Associated's Count III claim based on the independent tort of bad faith. The court ruled that Associated's cause of action for bad faith is limited to a statutory cause of action under Mo. Ann.Stat. § 375.420 (Vernon 1981). Alternatively, the court ruled that even if a common law cause of action for bad faith exists, Associated failed to establish a submissible case. Great weight is given to the conclusions of the local trial judge on questions of state law. *Lamb v. Amalgamated Labor Life Insurance Co.*, 602 F.2d 155, 160 (8th Cir. 1979).

Associated admits that Missouri courts have thus far been unwilling to hold that the independent tort of bad faith exists in first party coverage cases. Nevertheless, Associated argues that the court erred in directing a verdict on its independent tort of bad faith claim.

■ Missouri law recognizes an insured's recovery in tort against his insurer for the insurer's bad faith refusal to settle suits brought against the insured. *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750 (Mo.1950). The rationale for imposing liability in these types of third-party bad faith claim is "that the reservation of the exclusive right to contest or negotiate the claim against its insured imposes a fiduciary duty upon the carrier." *Young v. United States Fidelity & Guaranty Co.*, 588 S.W.2d 46, 47 (Mo.App.1979). Associated argues that this court should extend this

---

**14.** Instruction 12 stated:

Your verdict must be for defendant, if you believe:

First, plaintiff represented prior to defendant's rejection of the claim that HyPag had as of March 15, 1978, repaired and charged Fifty Seven Thousand Three Hundred Dollars ($57,300) for repair of smoke-damaged circuit boards, and

Second, the representation was false, and

Third, plaintiff knew it was false or did not know whether it was true or false, and

Fourth, the false representation was material, and

Fifth, plaintiff intended to deceive defendant.

If plaintiff knew the representation was false, the intent to deceive will necessarily be implied as the natural consequence of such act.

The term "material" as used in this instruction means it has some bearing on the subject matter.

bad faith doctrine to its first-party situation where Associated, as the insured, claims bad faith against its insurer, Aetna.

██ However, the Missouri legislature has provided a statutory remedy that is practically identical to the recovery provided by the independent tort cause of action. Section 375.420 provides:

> In any action against any insurance company to recover the amount of any loss under a policy * * * if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may * * * allow the plaintiff damages * * * and a reasonable attorney's fee * * *.

Mo.Ann.Stat. § 375.420 (Vernon 1981). The trend recognized by this circuit in *Robinson v. MFA Mutual Insurance Co.*, 629 F.2d 497 (8th Cir. 1980), supports the district court's conclusion that Missouri would not recognize the independent tort of bad faith in Associated's situation. In *Robinson*, we noted that: "Our research indicates that no state which has a statutorily prescribed penalty [for an insurer's wrongful refusal to pay] * * * has also permitted the bad faith tort by judicial fiat. * * * Apparently, the view is slowly spreading that states will have either the bad faith tort or the statutory penalty, but not both." *Id.* at 501–02 n.5. Since Missouri has a statutory penalty, we agree with the district court that Missouri would not extend the bad faith tort to first-party cases.[15]

Our position is also supported by the fact that no Missouri court has ever adopted this theory of tort liability.[16] As the Missouri Court of Appeals in *Young* stated: "When the occasion has arisen, our courts have noted that the 'first party' bad faith doctrine has not been recognized in this jurisdiction." *Young v. United States Fidelity & Guaranty Co.*, supra, 588 S.W.2d at 48

(citing *Craig v. Iowa Kemper Mutual Insurance Co.*, 565 S.W.2d 716, 724 (Mo.App.1978) ("We do not say whether a bad faith refusal by an insurer of a benefit owed directly to an insured on a policy can support an action in tort, but only that the tenor of our law suggests otherwise."); *Dyer v. General American Life Insurance Co.*, 541 S.W.2d 702, 705 (Mo.App.1976)); see also *Lamb v. Amalgamated Labor Life Insurance Co.*, supra, 602 F.2d at 160.

Affirmed.

action exists, Associated failed to make a submissible case.

---

**15.** Associated made a claim under Missouri's vexatious refusal to pay statute in Counts I and II. The district court directed a verdict against Associated on its vexatious refusal claims and Associated does not appeal that ruling.

**16.** Additionally, after carefully reviewing the record, we agree with the district court's conclusion that even if the bad faith tort cause of