# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1470

_____

Welspun Pipes, Inc., et al.

*Plaintiffs - Appellants*

v.

Liberty Mutual Fire Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: January 11, 2018
Filed: May 25, 2018

_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

On July 14, 2012, a fire damaged equipment vital to production at the Little Rock steel pipe manufacturing plant of Welspun Tubular, LLC, a wholly owned subsidiary of Welspun Pipes, Inc. (together, Welspun). The fire, which forced the plant to temporarily cease operations, was a covered peril under the RM Select Commercial Insurance Policy issued to Welspun by Liberty Mutual Fire Insurance Company (Liberty Mutual). The policy provided real property, personal property,

equipment breakdown, loss of business income, and extra expense coverages. In August 2012, Welspun submitted claims for real and personal property damage, loss of business income, and extra expenses. In March 2013, Liberty Mutual settled all claims except Welspun's claim for an additional $14 million in mitigation costs.

In July 2013, Welspun brought this diversity action, alleging that its unpaid mitigation costs were "necessary expenses" included in the policy's loss of business income coverage. Liberty Mutual responded that these costs could only be covered as "extra expenses," the policy limits of which were paid in the settlement. Ruling on the parties' cross motions for summary judgment, the district court[1] dismissed Welspun's complaint. Welspun appeals. Reviewing *de novo* the district court's interpretation of the insurance contract and its grant of summary judgment, we affirm. Source Food Tech., Inc. v. U.S. Fid. & Guar. Co., 465 F.3d 834, 836 (8th Cir. 2006) (standard of review).

## I.

**A. Background Facts.** In May 2012, Welspun was awarded a contract to supply approximately 220,000 metric tons of Submerged Arc Welded Pipe for the 670-mile Seaway Loop Pipeline from Cushing, Oklahoma to Houston, Texas. At the request of the Seaway construction manager, Enterprise Products Partners (Enterprise), Welspun agreed to convert 36,592 metric tons to a different type of Submerged Arc Welded Pipe that would be produced by a Welspun affiliate in India, Welspun Tradings Ltd., at no additional cost to Enterprise. The remaining 180,000 metric tons would be produced at Welspun's Little Rock facility for delivery on August 31, 2013 (sales value $275 million). Production in Little Rock was scheduled to begin on July 25, 2012.

---

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

The fire on July 14 suspended Little Rock operations. As the plant was scheduled to operate at full production capacity through at least August 2013, leaving no time to make up lost Seaway production time, Welspun concluded it would be unable to meet the August 31, 2013 Seaway delivery date. Enterprise would not accept a later date. Fearing it would lose the entire unsigned Seaway contract (a fear Liberty Mutual argued was unjustified), Welspun proposed having its affiliate in India, Welspun Tradings, produce 39,957 metric tons of pipe originally scheduled to be produced in Little Rock. Enterprise accepted the proposal. Welspun Tubular's Vice President assured his counterpart at Welspun Tradings that Welspun Tubular would bear all costs associated with the shift in production. Under this arrangement, Welspun fulfilled its obligations under the Seaway contract. The incremental costs Welspun incurred in shifting Seaway production from Little Rock to India are the mitigation costs here at issue.

**B. The Policy Provisions at Issue.** Section C of the policy's Coverages provided that, when "coverage for loss of **business income** is provided,"[2] Liberty Mutual will pay for:

1.    The actual loss of **business income you** incur during a **period of restoration** directly resulting from damage by a **peril insured against** to the type of property covered by this policy at a **covered location**.

2.    The necessary expenses **you** incur in excess of **your** normal operating expenses that reduces **your** loss of **business income**. **We** will not pay more than **we** would pay if **you** had been unable to make up lost production or continue operations or services.

The policy defined business income for manufacturing operations as "[t]he net sales value of production less the cost of all raw stock, materials and supplies utilized

---

[2]The policy uses boldface for terms that are expressly defined.

in such production." It defined period of restoration to mean, for buildings and equipment, the period that "starts at the time of a **covered loss**" and ends when, "using reasonable speed," the building and equipment could be repaired or replaced and "made ready for operations." The policy also covered loss of business income during an "Extended Period of Restoration," defined as a period that starts "when the **period of restoration** would end, and continues for no more than sixty (60) consecutive days immediately following the **period of restoration**."

Paragraph C.7. specified various actions that Welspun was required to take to mitigate its loss of business income and provided that Liberty Mutual "will not pay for any loss to the extent it can be reduced through these or any other means whether at a **covered location** or any other location." Paragraph C.9. provided that the most Liberty Mutual will pay for loss of business income coverage is the lesser of "actual loss of **business income** and necessary expense" or the policy limit on business income loss liability ($68 million).

Section D of the Coverages provisions provided that, when "coverage for **extra expense** is provided," Liberty Mutual will pay for "[t]he actual **extra expense you** incur during a **period of restoration** directly resulting from damage by a **peril insured against** to the type of property covered by this policy at a **covered location**," but will not pay for "[a]ny loss or expense recoverable elsewhere in this policy." Extra expense was defined as "reasonable and necessary extra costs: 1. Incurred to temporarily continue as nearly normal as practicable the conduct of **your** business; or 2. Of temporarily using property or facilities of **yours** or others."

**C. Procedural History.** In September 2012, Welspun submitted a claim for $47 million in business income losses, marking September 30 as the estimated end of the period of restoration (POR), when its damaged assets would be repaired, and extending the claim for a sixty-day extended period of restoration (EPOR) to November 30, 2012. Welspun also claimed $13 million in mitigation costs incurred

in shifting Seaway production to India, incremental expenses such as a steel price differential, shipping costs, and finishing costs to meet contract specifications. In November, Welspun submitted a revised claim for $28 million in business income losses through September 25 and $14.5 million in mitigation costs. Welspun stated its calculations should not be considered final but did not submit another claim.

In the March 2013 settlement, Liberty Mutual paid Welspun $22 million for its business income losses and $1 million for extra expenses (the Section D policy limit). The settlement expressly left unresolved Welspun's claim for approximately $14 million in mitigation costs. Welspun viewed the expenses as "necessary expenses" under Paragraph C.2. because they allowed Welspun to reduce its loss of business income by avoiding loss of the entire Seaway contract, whereas Liberty Mutual viewed the mitigation costs as additional "extra expense" under Section D, the policy limit of which was paid in the settlement. This lawsuit followed.

After discovery, Welspun and Liberty Mutual submitted cross motions for summary judgment. The district court concluded that "necessary expenses" covered by Paragraph C.2. of the policy must be expenses that reduce a *covered* business income loss. "It would be absurd to construe the insurance contract to include coverage for expenses incurred to avoid a loss that would not have been covered." Therefore, because the policy covered only business income losses that occurred during the POR and the EPOR, necessary expenses must reduce a loss of business income that would have occurred during that period.

Welspun's brief opposing Liberty Mutual's summary judgment motion stated: "Welspun contends that the POR did not end until November, 2012, when its operating condition was at its pre-fire operating capacity of six (6) days per week." Accepting for summary judgment purposes Welspun's contention that the POR extended to November 2012, which extended the EPOR to January 2013, the court concluded that Welspun failed to show that its alleged mitigation costs reduced a

covered loss of business income during this period. Though Welspun's expert opined that saving the Seaway contract avoided a net business income loss of $69 million over the life of the contract, there was no evidence that the expense of shifting some production to Welspun Tradings in India "averted a net decrease in [Welspun's] production value" during the POR and EPOR. Moreover, Welspun's expert opined that Welspun "was considered to be operating at capacity for the foreseeable future." In these circumstances, the mitigation costs did not qualify as necessary expenses because they did not reduce a covered loss of business income.

## II.

**A.** On appeal, Welspun first argues the district court erred in limiting the necessary expenses covered in Paragraph C.2. to expenses incurred to avoid or reduce a loss of business income during the POR or EPOR, because that temporal limitation is not in the plain language of the Loss of Business Income coverage provisions. The argument misleadingly recasts the district court's decision. The court's core ruling was that necessary expenses, by reason of the policy's plain language and evident purpose, are expenses that reduce a *covered* loss of business income. An expense reducing a covered loss, whenever incurred, could be a covered necessary expense under Paragraph C.2. It is Paragraph C.1. and Paragraph A.7. of the Extensions of Coverage provision that expressly limit the coverage of business income losses to those incurred during the POR or the EPOR.

Turning to the district court's core ruling, the common law imposed a duty on the insured to mitigate a covered loss the insurer would otherwise pay, and a corresponding right to compensation from the insurer for the cost of these efforts. The right to compensation was often recognized even in the absence of an express policy provision, but "to be recoverable, the mitigation expenses must relate to a covered loss either existing or imminent." 11A Steven Plitt, et al., Couch on

-6-

Insurance § 168.11, at 168-26 (3d ed. 2017); see Witcher Constr. Co. v. St. Paul Fire & Marine Ins. Co., 550 N.W.2d 1, 7-8 (Minn. App. 1996).

The common law duty to mitigate and corresponding right to expense reimbursement are now often reflected in "loss of business income" or "business interruption" policy provisions. See Nw. States Portland Cement Co. v. Hartford Fire Ins. Co., 360 F.2d 531, 534-35 (8th Cir. 1966).[3] The district court concluded these basic common law principles were reflected in the business income loss provisions of Liberty Mutual's policy. The court noted that Paragraph C.2. expressly provides that Liberty Mutual will not pay more than it would have paid under Paragraph C.1. for the actual loss of business income incurred during a POR or EPOR that could not be mitigated.

The parties and the district court agreed that Arkansas law governs this diversity lawsuit. Under Arkansas law, courts interpreting an insurance policy should consider "the object to be accomplished" and read its provisions together, not in isolation. Cont'l Cas. Co. v. Davidson, 463 S.W.2d 652, 655 (Ark. 1971). Reading the loss of business income policy provisions together, in light of their historical roots and obvious purpose, we agree with the district court that "necessary expenses" in Paragraph C.2. are limited to expenses that reduce a *covered* business income loss. Paragraph C.1. provides loss of business income coverage for "[t]he actual loss of

_____

[3]An analogous policy provision is the "sue and labor" clause in marine insurance policies that obligates the insured to incur expenses to protect and repair the insured vessel, and obligates the insurer to pay for these expenses even if the ship becomes a total loss. See 12 Russ & Segalla, Couch on Insurance § 183.62 (3d ed. 1998). "The fundamental limitation on the insurer's duty . . . to compensate the insured for expenses incurred . . . is that the expenses in question must be incurred to preserve the insured property from a peril insured against under the basic policy." Id. § 183.163, at 183-117; accord GTE Corp. v. Allendale Mut. Ins. Co., 372 F.3d 598, 618 (3d Cir. 2004), applying this principle to the sue and labor clause in a non-maritime property/business interruption policy.

**business income** . . . during a **period of restoration**." Paragraph C.2. then covers necessary expenses that reduce "**your** loss of **business income**." Paragraph C.7. imposes the insured's common law duty to mitigate covered losses, if necessary by incurring non-normal expenses that Paragraph C.2. then obligates Liberty Mutual to reimburse. Paragraph C.9. confirms the link between actual loss of business income and necessary expenses.

Welspun argues mitigation costs incurred to reduce even uncovered business income losses qualify as necessary expenses under Paragraph C.2. Welspun starts from the premise that Paragraph C.7 requires Welspun to mitigate all business income losses, which in turn obligates Liberty Mutual to pay Welspun the costs it incurs in mitigation. The premise is faulty. The common law duty to mitigate reflected in Paragraph C.7. is a duty owed *to the insurer* to reduce the insurer's obligation to indemnify, which of course is limited to the insured's *covered* losses. See Metalmasters of Mpls., Inc. v. Liberty Mut. Ins. Co., 461 N.W.2d 496, 501 (Minn. App. 1990) ("Mitigation is a duty the insured performs for the insurer's benefit."). "Protective acts may be to the direct or incidental benefit of the assured so as to prevent further loss to its own property—but it is patently clear that the primary reason for such a [duty-to-mitigate] provision within the policy is for the [insurer's] protection against liability for greater loss." Slay Warehousing Co. v. Reliance Ins. Co., 471 F.2d 1364, 1367 (8th Cir. 1973).

Of course, a peril such as fire that is covered by property and business interruption insurance can cause collateral or extended loss to the insured's property or business beyond the policy's basic coverages. The insured may have no *duty* to mitigate those losses, but it may procure an insurance policy that includes coverage reimbursing expenses that mitigate such losses. That was the basis for our decision in Midwest Regional Allergy v. Cincinnati Ins. Co., 795 F.3d 853, 858 (8th Cir. 2015), where we upheld a claim for extra expenses that did not reduce covered business income loss because the claim fell under an Extra Expense provision in the

Additional Coverages section of the policy that covered expenses "not connected to the Business Income provision." Likewise the additional coverage for extra expenses in Section D of the Liberty Mutual policy was not limited to expenses that reduce covered losses.

An example demonstrates how these provisions interact. Suppose a fire at a bakery threatened the loss of $75 in business income during the indemnified period. Consistent with its duty to mitigate, the bakery spends $20 in mitigation and reduces its covered business income loss to $35. Under Paragraph C.2., the $20 is a necessary expense because it reduced a covered business income loss. Under Paragraph C.9., Liberty Mutual would pay the bakery $55 (if within the policy limit) -- $20 in necessary expense and $35 in actual business income loss, which is below the $75 ceiling established by the second sentence of Paragraph C.2. On the other hand, if the bakery spent $50 to reduce its covered business income loss to $35, the second sentence would limit recovery to $75.

Under Welspun's interpretation of the policy, if the bakery incurs $75 of actual business income loss during the period of indemnity, and spends $20 to reduce an uncovered loss of business income in a later period, it is entitled to $95. In this variation of the hypothetical, rather than reduce the insurer's obligation to indemnify actual business income loss, the $20 of "mitigation" expenses *increases* the insurer's coverage obligations. One would expect an additional coverage for this kind of "extra expense" would be found in a separate section of the policy (here, Section D), and be purchased separately. Cf. Liberty Mut. Ins. Co. v. Sexton Foods Co., 854 S.W.2d 365, 367 (Ark. App. 1993) (business interruption insurance is "designed to prevent the insured from being placed in a *better* position than if no loss or interruption of the business had occurred.").

The second sentence of Paragraph C.2. provides that Liberty Mutual will not pay more than it would pay if Welspun "had been unable to make up lost production

or continue operations or services." We agree with the district court that Paragraph C.2. is limited to additional expenses that are necessary because they reduce a covered business income loss.

**B.** Welspun next argues that the district court erred in granting summary judgment even if the court correctly interpreted the policy's "necessary expenses" coverage. The lengthy argument in essence refuses to accept the district court's interpretation of the business income loss provisions. Welspun begins by arguing that the POR and EPOR periods are disputed, unresolved fact issues. This is a non-issue. The district court accepted the position Welspun urged for summary judgment purposes, that the POR ended in November 2012, not September 25, 2012 as Liberty Mutual contended, which meant the EPOR extended through January 2013. Welspun had the burden to prove it incurred necessary expenses to reduce covered business income losses during this period. See Reynolds v. Shelter Mut. Ins. Co., 852 S.W.2d 799, 803 (Ark. 1993). The court could do no more than accept the position of the party opposing summary judgment on this issue.

Welspun next argues the district court ignored that, before the fire, Welspun had planned production for the Seaway contract during July, August, October, and November 2012. This contention ignores footnote 7 of the court's lengthy opinion. It is undisputed the Little Rock plant was not operational between the date of the fire and September 25, 2012. As the court explained, income from production lost during this period, including scheduled Seaway production, was an actual business income loss covered by Paragraph C.1. of the policy and paid as part of the March 2013 settlement. No mitigation costs Welspun incurred could have *reduced* that loss.

The planned Seaway production in October and November 2012 raised a more complex question. Welspun alleged that saving the Seaway contract avoided a business income loss of $69 million dollars over the life of the contract and allocated a prorated $22 million loss over the EPOR period, resulting in a business income loss

-10-

reduction greater than the $14 million of claimed mitigation expenses. The district court took a more fact-specific approach, concluding it was Welspun's full production schedule and its ability to shift production from other projects into this period that reduced the covered business income loss Welspun incurred. Therefore, while expenses Welspun incurred to save the Seaway contract may have preserved income from pipe it produced after the EPOR and delivered to Seaway by August 2013, this was not evidence satisfying Welspun's burden to show that its "mitigation expenses" reduced *covered* business income losses. After careful review of the summary judgment record, we agree with the district court's analysis. With the Seaway contract safely kept in place, Welspun postponed production planned for that contract between September 25, 2012, and January 2013, replacing it with other, higher income projects that mitigated its covered business income loss (evidence submitted by Welspun's expert).[4] There was no evidence that spending $14 million to shift some Seaway production to India was "necessary" to satisfy Welspun's duty to mitigate Liberty Mutual's obligation to indemnify covered business income losses.

Finally, Welspun argues that the district court's interpretation of the policy "penalizes" Welspun for undertaking its duty to mitigate loss of business income by saving the Seaway contract. But Welspun persists in treating the duty to "mitigate" as a general duty to save the insured from all loss. A duty is an obligation owed to another, here, as the common law origins make clear, to the insurer that is obligated to indemnify (cover) specific losses. Welspun argues it is unfair to deny coverage for "mitigation" expenses that permitted it to "shift out" to a later period business income from the Seaway contract that would otherwise have been lost. Of course, Welspun was hardly "penalized" for spending $14 million to save a Seaway contract that

---

[4]Welspun originally planned to produce Seaway pipe in October but instead shifted production to other projects, primarily the Access NEX project. Because Access NEX pipe had a higher sales value than Seaway pipe, Welspun made more profit in October than if it produced Seaway pipe as originally planned, what Welspun's expert described as a "negative [business income] loss."

would generate $69 million in profit.  That was a sound business decision, and if the expense was covered by insurance, so much the better.  But as the plain language of the Liberty Mutual policy, the origins of loss of business income coverage, prior cases and insurance treatises, and the undisputed facts established in this summary judgment record make clear, the incremental costs Welspun incurred in shifting some Seaway production to an affiliate in India were not "necessary expenses" within the meaning of Paragraph C.2. of the Liberty Mutual policy.

The judgment of the district court is affirmed.

_____